Argued and submitted December 4, 1990, decision of Court of Appeals reversed in part and affirmed in part, judgment of circuit court reversed in part; otherwise affirmed July 9, reconsideration denied August 25, 1992

William H. SHOCKEY,
*Respondent on Review,*

*v.*

CITY OF PORTLAND,
Jack C. Irvin and John Lang,
*Petitioners on Review.*

(CC A8611-06957; CA A49282; SC S36999)

837 P2d 505

Harry Auerbach, Deputy City Attorney, City of Portland, argued the cause and filed the petition for petitioners on review.

Richard C. Busse, Portland, argued the cause for respondent on review. With him on the response brief was Donald B. Potter, Portland.

Robert D. Durham, of Bennett & Durham, Portland, filed a brief on behalf of *amici curiae* Oregon Trial Lawyers Association, American Civil Liberties Union, Oregon Education Association, AFSCME Council 75, AFSCME Local 189, Portland Police Commanding Officers Association, Portland Police Association, and Oregon Public Employees Union.

GILLETTE, J.

Unis, J., concurred in part and dissented in part and filed an opinion in which Van Hoomissen and Fadeley, JJ., joined.

## GILLETTE, J.

This action for damages involves a city employee's claim that he was wrongfully terminated in retaliation for circulating a petition protesting a work safety policy. The circuit court directed a verdict against the employee. The Court of Appeals reversed the judgment of the circuit court, holding that firing petitioner for circulating the petition would violate petitioner's right to free speech under the federal constitution.[1] *Shockey v. City of Portland*, 100 Or App 166, 785 P2d 776 (1990). We reverse in part and affirm in part the decision of the Court of Appeals.

Plaintiff was a wastewater mechanic for defendant City of Portland (city). Defendants Lang and Irvin were his supervisors. During 1984, the city considered implementing a policy requiring wastewater mechanics and other employees who could be exposed to chlorine gas to wear respirators. Pursuant to an administrative rule, the policy also included a provision that required bearded employees to shave any facial hair that would be located under the sealing surface of the respirator.

Plaintiff, who has worn a beard for over 25 years, strongly opposed the policy. He circulated within his own city agency a petition that stated:

"We, the undersigned, find the proposed rules demanding that beards be shaved *before* a respirator test can even be taken to be arbitrary and discriminatory. The wearing or not wearing of beards was not a condition of employment and any hazards that exist now existed at that time. Furthermore, if everyone on site is to be available in a chlorine emergency, the questions of fit, maintenance and hygiene of the respirators, the supplying of respirators for those who wear glasses, training of all employees in their use, hazard pay, and the availability of respirators for office staff, contractors' employees and visitors must be answered. The aforementioned proposed rules do not take into account the use of respirators by the last three mentioned groups.

---

[1] The First Amendment to the United States Constitution, provides:

"Congress shall make no law * * * abridging the freedom of speech * * *."

"It would be far more practical to have a volunteer crew, specially trained and outfitted to deal with chlorine in emergency and non-emergency situations."

(Emphasis in original.)

In August 1984, the city implemented the policy. Plaintiff refused to shave his beard and sought to be exempted from the policy by providing an evaluation from a social worker that he "is a normally integrated man who has organically integrated his beard into his identity." Evidence also indicated that plaintiff would develop "a most uncomfortable and distressing facial inflammatory skin eruption" if he shaved. The city refused to make an exception for plaintiff. Plaintiff did not shave off his beard. On June 10, 1985, the city discharged him.

Plaintiff sought review by the city's Civil Service Board. The board found that, in violation of the city's charter, the "discharge decision was not made in good faith for the purpose of improving public service" and ordered that plaintiff be reinstated with back pay.

Plaintiff then brought an action for damages based on the common law tort of wrongful discharge.[2] He also claimed damages under 42 USC § 1983, on the ground that his employment had been terminated wrongfully because he had exercised his constitutionally protected right of free speech when he circulated the petition. Plaintiff also brought a claim against Lang and Irvin as individuals for intentional interference with economic relations.[3]

The case was tried to a jury. After plaintiff rested his case, the circuit court granted defendants' motion for directed verdict on the wrongful discharge and § 1983 claims, finding that there was "no evidence to indicate that [plaintiff] was terminated as a result of the circulation of the petition." The jury found in favor of plaintiff on the remaining claim against Lang and Irvin for intentional interference with economic relations, but awarded no damages.

---

[2] The common law tort of wrongful discharge was recognized by this court in *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975).

[3] Before trial, plaintiff voluntarily dismissed a separate claim that is not relevant to this appeal.

Plaintiff appealed, contending that the circuit court erred in granting the directed verdict. The Court of Appeals agreed with plaintiff and reversed the circuit court's entry of the directed verdict on both the wrongful discharge and § 1983 claims. The Court of Appeals held that "there was evidence of a causal link between plaintiff's petition and his termination" and that the petition was constitutionally protected by the free speech guarantee of the First and Fourteenth Amendments to the United States Constitution.[4] *Shockey v. City of Portland*, 100 Or App 166, 170, 785 P2d 776 (1990). Defendants then petitioned this court for review, which we allowed. 310 Or 195, 795 P2d 554 (1990).

■    Defendants first contend that the circuit court lacked subject matter jurisdiction over plaintiff's common law wrongful discharge claim. Defendants reason that plaintiff's common law wrongful discharge claim is, in essence, a complaint alleging an unfair labor practice, "for which the Public Employees Collective Bargaining Act [PECBA], ORS 243.650 to 243.782, provides his exclusive remedy." Defendants argue in the alternative that, to the extent plaintiff's claim is not foreclosed by PECBA, "plaintiff's exclusive judicial remedy for challenging defendants' action is by writ of review, under ORS 34.010 to 34.100."

PECBA defines certain acts as unfair labor practices. Under the Act, the Employment Relations Board (ERB) is responsible for investigating complaints alleging unfair labor practices and, if necessary, conducts a hearing before issuing a final order. ORS 243.676.

ORS 243.672(1)(g) provides:

"(1)   It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

---

[4] The Court of Appeals also held that the trial court erred in striking plaintiff's request for attorney fees under 42 USC § 1988 and in granting defendants' motion for summary judgment on plaintiff's claim for punitive damages under 42 USC § 1983. *Shockey v. City of Portland*, 100 Or App 166, 170, 785 P2d 776 (1990). The Court of Appeals affirmed the circuit court in striking plaintiff's request in his intentional interference claim for attorney fees incurred in reinstatement proceedings before the Civil Service Board. *Id.* at 171. Defendants do not challenge those holdings before this court.

"(g)    Violate the provisions of any written contract with respect to employment relations[.]"

The collective bargaining agreement between the city and the union to which plaintiff belonged stated that the city could not discharge any employee "without just cause." We understand defendants to argue that plaintiff's claim for common law wrongful discharge constitutes an unfair labor practice under ORS 243.672(1)(g), because the discharge would be without just cause in violation of the collective bargaining agreement. We shall assume, for the purposes of this opinion, that firing plaintiff "without just cause" would be an unfair labor practice that ERB could investigate. ORS 243.672(1)(g) and (4); ORS 243.676.

Defendants' argument requires us to consider whether PECBA deprives the circuit court of subject matter jurisdiction over the wrongful discharge action. ORS 243.676(1) charges ERB with investigating an unfair labor practice complaint. ERB holds a hearing to determine whether the person named in the complaint has engaged in or is engaging in any unfair labor practice. If so, ERB must state its findings of fact, order the person to cease and desist from the unfair labor practice, take "such affirmative action, including but not limited to the reinstatement of employees with or without back pay, as necessary to effectuate the purposes of" PECBA, and award representation costs and attorney fees. ORS 243.676(2).

PECBA, while granting jurisdiction to ERB to investigate and hear unfair labor practice complaints, is silent as to whether the Act was intended to foreclose common law state remedies, such as claims for wrongful discharge, and a review of the legislative history does not provide the answer to this issue.

This court has summarized its methodology in determining whether the legislature intended to foreclose a common-law remedy when it created a statutory one as follows:

"[A]n actionable common law tort [remains actionable] * * * unless the provisions of [the allegedly conflicting legislation] demonstrate the legislature's intent not only to provide what it considered to be adequate remedies to * * * plaintiff, but by implication show a legislative intent to abrogate or supersede

any common law remedy for damages. *See Brown v. Transcon Lines*, 284 Or [597], 611[, 588 P2d 1087 (1978)]."

*Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90-91, 689 P2d 1292 (1984).

PECBA expressly states that its purpose is to ensure that public employers and public employees enter into negotiations and collective bargaining agreements. For instance, ORS 243.656(5) states that:

> "It is the purpose of [PECBA] to obligate public employers, public employees and their representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations and to enter into written and signed contracts evidencing agreements resulting from such negotiations. It is also the purpose of [PECBA] to promote the improvement of employer-employee relations within the various public employers by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers."

PECBA also declares that the "people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees," ORS 243.656(1); that "[r]ecognition by public employers of the right of public employees to organize and full acceptance * * * [of] collective negotiation between public employers and public employee organizations can alleviate various forms of strife and unrest," ORS 243.656(2); that "[e]xperience in private and public employment has also proved that protection by law of the right of employees to organize and negotiate collectively safeguards employees and the public from injury, impairment and interruptions of necessary services, and removes certain recognized sources of strife and unrest," ORS 243.656(3); and that "[t]he state has a basic obligation to protect the public by attempting to assure the orderly and uninterrupted operations and functions of government," ORS 243.656(4).

The purpose and policy underlying PECBA is that public employers and public employees resolve their disputes through resort to collective bargaining when there is a collective bargaining agreement. That approach is consistent with

this state's policy that, ordinarily, an employee who is subject to a collective bargaining agreement first must utilize any collective bargaining agreement procedures as the vehicle for redress of disputes before resorting to a court action. *See, e.g., Gilstrap v. Mitchell Bros. Truck Lines*, 270 Or 599, 606, 529 P2d 370 (1974) *cert den* 421 US 1011 (1975) (so holding).

We perceive no reason to say that plaintiff's claim for wrongful discharge offends the purpose and policy of PECBA or this court's requirement that a complaining party first pursue its contractual remedies before seeking help from the court system. The present action does not interfere with PECBA's purpose of requiring public employers and employees to enter into negotiations and collective bargaining agreements, nor does it thwart the act's intent that disputes first be resolved through resort to contract remedies — plaintiff successfully exhausted his contract remedies when he appeared before the Civil Service Board. In this action, plaintiff seeks damages that were not available to him either before the Civil Service Board or before ERB. In short, in the terms of the standards identified in *Holien v. Sears, Roebuck and Co., supra*, there has been no demonstration of *either* the legislature's intent to identify and provide an adequate remedy for all the harm suffered by plaintiff *or* of a legislative intent to supersede this common law remedy. The circuit court has subject matter jurisdiction to hear plaintiff's claim.[5] *Cf. Tracy v. Lane County*, 305 Or 378, 752 P2d 300 (1988) (ERB's jurisdiction under PECBA not exclusive, but is primary where the right of a party to seek relief in circuit court depends on defendant's having committed an unfair labor practice).

■ Defendants next contend that the circuit court lacked subject matter jurisdiction over plaintiff's common law wrongful discharge claim because, defendants assert, plaintiff's sole judicial remedy under state law is a writ of review under ORS 34.010 to 34.100. Defendants rely on *Koch v. City of Portland*, 306 Or 444, 760 P2d 252 (1988), to support that assertion. Defendants' assertion is incorrect, and their reliance on *Koch* is misplaced.

---

[5] Our decision today speaks only to whether PECBA forecloses a particular form of tort action. We do not decide whether other types of claims likewise would be available in spite of the fact that PECBA was implicated.

The sole issue before this court in *Koch v. City of Portland, supra*, was whether the decision of the Mayor of the City of Portland, acting in his capacity as Commissioner of Public Safety, to suspend a Portland police officer "was made 'in the exercise of judicial or quasi-judicial functions[.]' " *Id.* at 447. This court held that the suspension decision was a quasi-judicial act and, therefore, was reviewable by writ of review. *Id.* at 448-49. This court did not hold in *Koch*, or in any other case that has been brought to our attention, that, because writ of review is available to review a termination decision, the affected employee is precluded from bringing an action for damages based on the common law tort of wrongful discharge.

As previously stated, plaintiff appealed his termination to the City of Portland Civil Service Board pursuant to Portland City Charter Section 4-501. The Civil Service Board found in plaintiff's favor, reinstated plaintiff with back pay and restored seniority and benefits. In *Miller v. Schrunk*, 232 Or 383, 388, 375 P2d 823 (1962), this court held:

> "When any charter or statute sets out a procedure whereby an administrative agency must review its own prior determination, that procedure must be followed. Judicial review [by way of writ of review] is only available after the procedure for relief within the administrative body itself *has been followed without success.*"

(Emphasis added.) Plaintiff's success before the Civil Service Board made writ of review not only unnecessary, but unavailable. The circuit court has subject matter jurisdiction over plaintiff's common law wrongful discharge claim. We turn now to a consideration of the evidence on the merits of plaintiff's claims.

■　　　Defendants argue that the trial court did not err in directing verdicts as to plaintiff's wrongful discharge and 42 USC § 1983 claims, because there was no evidence of a causal connection between plaintiff's circulation of the petition and his discharge.

■　　　In determining whether the trial court erred in entering a directed verdict for defendants, we view the evidence in the light most favorable to the non-moving party — in this case, plaintiff — and extend to that party the benefit of every reasonable inference that may be drawn from the

evidence. *Foster v. Schnell Refrigeration Co.*, 280 Or 411, 414, 571 P2d 497 (1977).

The evidence would permit a trier of fact to find that Irvin and Lang were hostile toward plaintiff's attempt to receive an exemption from the challenged policy. Other employees testified that management retaliated against employees who spoke out against management practices or on safety issues by firing them.[6] Lang admitted that plaintiff's petition made him angry and caused him some anxiety. Irvin admitted that he did not help plaintiff find other comparable city employment before terminating him, although he had assisted other employees who did not comply with the facial hair policy. While plaintiff had no proof to spare, the foregoing evidence, when combined with the reasonable inferences that can be drawn therefrom, was sufficient to allow a trier of fact to conclude that plaintiff was discharged for circulating his petition. The trial court's ruling to the contrary was error.

The foregoing sufficiency argument is the last argument asserted by defendants against the decision by the Court of Appeals to reinstate plaintiff's wrongful discharge claim.[7] Having found no error with respect to any of the claims that defendants make here, we affirm the Court of Appeals' decision to reinstate plaintiff's wrongful discharge claim. We turn next to defendants' contentions that deal specifically with plaintiff's claim under 42 USC § 1983.

■ After obtaining reinstatement through the civil service process, plaintiff brought the present action, claiming that firing him because he wrote the aforementioned petition violated his right to free speech under the federal Constitution and that such a violation was actionable under 42 USC § 1983. No one disputes the latter half of his theory — if the circumstances of plaintiff's firing violated his free speech

---

[6] Contrary to defendants' position taken in their petition to this court, defendants did not object to all of the testimony supporting the foregoing summary, and the evidence was not excluded by the trial court.

[7] We do not intimate that the evidence to which we have referred necessarily makes out a case of wrongful discharge. But, because the only challenge that defendants make in this court is to the sufficiency of the evidence of wrongful discharge, we have not considered and do not address the other elements of that tort or whether evidence of the other elements was present in this case.

rights under the First Amendment, the firing is actionable. The fight here is over the first half, *viz.*, whether firing plaintiff on account of the petition violated his right to free speech.

Review of the relevant case law — case law coming from the United States Supreme Court, because the claim arises under federal law — leads us to conclude that one need consider only two pertinent cases to see that plaintiff fails to meet the criteria for obtaining the relief that he seeks. Because those cases are dispositive, we discuss them at some length.

The first important case was *Pickering v. Board of Education*, 391 US 563, 88 S Ct 1731, 20 L Ed 2d 811 (1968). Pickering, a high school teacher, had written a letter to a newspaper criticizing the local school board and the district superintendent for the way they had handled recent school financing efforts. He was fired. After the firing had been sustained in the state courts, the United States Supreme Court granted certiorari and reversed.

The Court first made it clear that public employees do not forfeit free speech rights by accepting public employment. *Id.* at 568. The Court recognized that a public employer has a right to expect loyalty on the part of its employees, but that loyalty could not be exacted at the expense of the right of the public employees to voice their views as to certain issues. Just which issues would transcend the rights of the employer to discipline its employees could not be described categorically, the Court admitted. However, the Court said,

> "in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run."

*Id.* at 569.

The Court began by noting that nothing in Pickering's letter implicated a close working relationship between Pickering and any of the persons whom he was criticizing. "Thus," the Court said, "no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here." *Id.* at 570. Therefore, the

Court held, a public employee's "comments on matters of public concern that are substantially correct" could not furnish grounds for dismissal, even if those comments were critical in tone. *Id.*

The Court then proceeded to examine the false statements that it found in Pickering's letter. As to those, the Court held, there was no proof of any harm to the district or its interests caused by the letter. (Indeed, the Court noted, "Pickering's letter was greeted by everyone but its main target, the Board, with massive apathy and total disbelief." *Id.*) "More importantly," the Court noted,

> "the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.
>
> "* * * * *
>
> "What we * * * have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."

*Id.* at 571-73. (Footnote omitted.)

The Court's constant references to issues of "public importance" was no accident. As it summarized its holding:

> "In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public

importance may not furnish the basis for his dismissal from public employment."

*Id.* at 574. (Footnote omitted.) It is clear, both from text and context, that *Pickering* was based on the public's interest in the subject matter of Pickering's letter as a whole. It was the lack of that interest that proved fatal in the other pertinent decision of the Court.

In *Connick v. Myers*, 461 US 138, 103 S Ct 1684, 75 L Ed 2d 708 (1983), the fired public employee, Myers, was an assistant district attorney. She objected to a proposal to transfer her to another section of the office and, when her protestations did not help, she resorted to circulating a 14-item "questionnaire" to her fellow employees that was not-so-subtly critical of the district attorney and his principal lieutenants. The district attorney determined that the questionnaire was an act of insubordination and fired her. She then brought an action in federal court under 42 USC § 1983, claiming that her free speech rights had been violated. Both the district court and the court of appeals sustained her claim. On certiorari, the United States Supreme Court reversed.

The district attorney maintained before the Court that Myers' questionnaire concerned only internal office matters and, as such, did not constitute speech of "public concern," as that phrase had been used in *Pickering*. As a general matter, the Court was inclined to agree:

"Although we do not agree that Myers' communication in this case was wholly without First Amendment protection, there is much force to [the district attorney's argument]. The repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental. This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter."

*Id.* at 143. (Footnote omitted.) The key to *Pickering*, the Court explained, was the fact that "Pickering's subject was 'a matter of legitimate public concern' upon which 'free and open debate is vital to informed decisionmaking by the electorate.'" *Id.* at 145. (Citation omitted.) In fact,

"*Pickering*, its antecedents, and its progeny lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

*Id.* at 146. (Footnote omitted.)

The Court was not drawing a line between employee speech wholly unrelated to any matter of general public concern, on the one hand, and speech that touches in some minor way on matters of public concern, on the other. Even speech that alludes to matters of public concern does not, by virtue of that fact alone, bring the speaker within the ambit of First Amendment protections sufficient to support an action under 42 USC § 1983. The Court explained:

"Whether an employee's speech addresses a matter of public concern *must be determined by the content, form, and context* of a given statement, as revealed by the whole record. In this case, with but one exception, the questions posed by Myers to her co-workers do not fall under the rubric of matters of 'public concern.' We view the questions [in the questionnaire] pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. * * * [W]e do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [the district attorney] and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of

controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre.

"To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark — and certainly every criticism directed at a public official — would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."

*Id.* at 147-48. (Emphasis supplied.)

Not all cases could be resolved by this analysis, however. Some, including *Connick*, would require a further step. The Court explained:

"One question in Myers' questionnaire, however, does touch upon a matter of public concern. Question 11 inquires if assistant district attorneys 'ever feel pressured to work in political campaigns on behalf of office supported candidates.' * * *

"Because one of the questions in Myers' survey touched upon a matter of public concern and contributed to her discharge, we must determine whether [the district attorney] was justified in discharging Myers. * * *."

*Id.* at 149. (Footnotes omitted.) In other words, if, *when read in context,* part of Myers' questionnaire "touched on a matter of public concern," it was necessary to proceed to a second step in the analysis. That step involved balancing the interests of management and employee.

The Court then examined the various considerations that, under *Pickering,* should play a role in such a balancing analysis. A court in striking the balance was required to give "full consideration" to the government's interest in effective and efficient performance of its public responsibilities. *Id.* at 150. It was also pertinent that Myers' distribution of the questionnaire interfered with the necessarily close working relationship required between a deputy prosecutor and her superiors. *Id.* at 151-52. The time, place, and manner in which the questionnaire was circulated were also relevant. *Id.* at 152-53.

It was clear, however, that the context in which the questionnaire was circulated was, even in the balancing phase of the analysis, the most important factor to the Court. The Court reviewed that consideration and then announced its conclusions, as follows:

> "Finally, the context in which the dispute arose is also significant. This is not a case where an employee, out of purely academic interest, circulated a questionnaire so as to obtain useful research. Myers acknowledges that it is no coincidence that the questionnaire followed upon the heels of the transfer notice. When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. * * *

> "Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that [the district attorney] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment. * * *

> "* * * [I]t would indeed be a Pyrrhic victory for the great principles of free expression if the [First] Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here."

*Id.* at 153-54. Thus, it will be seen that "context" is a pertinent consideration in both the first and second steps of the *Connick* analysis.

It will be clear from the foregoing that we do not disagree with the dissent as to the appropriate analytical framework. The difference between our view and that of the dissent is simple: We do not find the wording of plaintiff's petition, *in context*, to require us to proceed beyond the first step in the *Connick* analysis. As to that first step, the parallels between this case and *Connick* are great and, where there are

differences, the differences do not favor plaintiff. The similarities:

1. Both cases arose out of an employee's dissatisfaction with a management decision that affected that particular employee in a way that the employee disliked.

2. Both employees attempted to enlist the views of fellow workers in support of their positions.

3. The principal thrust of each employee's message concerned the employee's particular grievance.

4. There is no suggestion that either employee raised any issue beyond the employee's immediate personal grievance other than for the purpose of gathering ammunition for the principal, personal fight that the employee already was waging.

5. Each employee confined the dispute to the workplace and to pertinent supervisory personnel.

The differences:

1. Plaintiff here chose a more direct form of challenge even than that employed in *Connick*. The questionnaire there at least purported to be intended for employees, not for management. The petition here was a direct challenge to management.

2. Unlike Myers' attitude in the *Connick* case, plaintiff's attitude here made him a less fit employee than others who complied with the shaving policy, because plaintiff could not assist in circumstances requiring use of a respirator.

3. Perhaps most importantly, there truly is no matter raised by plaintiff's petition that is of "public concern," at least in the *Pickering* and *Connick* sense of that term. Plaintiff here was not challenging any act of his supervisors as illegal. He was not speaking to any matter that either had been or would be put to a public vote. And he was not protesting, even indirectly, office policy that was requiring other employees to give up or compromise one or another of their rights as citizens. In other words, this employee cared

about his beard, period. To elevate that concern to a constitutional case merely because the employee mustered an argument related to public policy in pursuit of his personal goal would so trivialize the "public concern" requirement of *Pickering, Connick,* and other cases, as to read the requirement virtually out of existence.

Although its stated ground for its decision was incorrect, the circuit court did not err in dismissing plaintiff's claim under 42 USC § 1983. The Court of Appeals decision to the contrary was error.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is reversed as to the wrongful discharge claim; otherwise affirmed.

**UNIS, J.,** concurring in part, dissenting in part.

The majority misreads well-established First Amendment[1] precedent used to determine the free speech rights of public employees. In so doing, the majority misconstrues the class of speech on which public employees may speak out without fear of retaliation. The majority's opinion has the potential to discourage disclosures of the sort of information that the public employee is particularly, and often uniquely, able to provide. Thus, the majority's opinion may deprive the public of valuable information with which to evaluate the performance of elected officials.

Plaintiff, a wastewater mechanic for the City of Portland (city), was discharged after he circulated a petition within his agency protesting a work safety policy.[2] The city's

---

[1] The First Amendment to the United States Constitution provides:

"Congress shall make no law * * * abridging the freedom of speech * * *."

[2] Plaintiff's petition stated:

"We, the undersigned, find the proposed rules demanding that beards be shaved *before* a respirator test can even be taken to be arbitrary and discriminatory. The wearing or not wearing of beards was not a condition of employment and any hazards that exist now existed at that time. Furthermore, if everyone on site is to be available in a chlorine emergency, the questions of fit, maintenance and hygiene of the respirators, the supplying of respirators for those who wear glasses, training of all employees in their use, hazard pay, and the availability of respirators for office staff, contractors' employees and visitors must be answered. The aforementioned proposed rules do not take into account the use of respirators by the last three mentioned groups.

Civil Service Board found that, in violation of the city's charter, the "discharge decision was not made in good faith for the purpose of improving public service," and ordered that plaintiff be reinstated with back pay. The majority concludes that the dismissal of plaintiff's 42 USC § 1983[3] claim did not violate plaintiff's free speech rights under the First Amendment, because the petition did not address a matter that, in the majority's view, is of public concern.[4]

It is beyond dispute that speech by a public employee which discloses information on matters of public health and safety is of public concern.[5] Because all but the first two sentences of plaintiff's petition address matters of public health and safety and because there is no evidence in the record that the circulation of the petition adversely affected the operations of the city, interfered with plaintiff's working relationship with his fellow employees, or impaired workplace discipline, I dissent from the majority's holding that denies plaintiff the right to proceed under § 1983. I concur, however, in the majority's decision concerning plaintiff's common law claim for wrongful discharge.

Plaintiff's action under § 1983 is based on his claim that his employment had been terminated wrongfully in retaliation for exercising his right to free speech under the First Amendment. At his jury trial, after plaintiff rested his case, the trial court directed a verdict on the § 1983 claim, finding that there was insufficient evidence of causation, *i.e.*, that there was "no evidence to indicate that [plaintiff] was

---

"It would be far more practical to have a volunteer crew, specially trained and outfitted to deal with chlorine in emergency and non-emergency situations." (Emphasis in original.)

[3] 42 USC § 1983 provides:

"Every person who, under color of any statute, ordinance, regulations, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *"

[4] Remarkably, the majority recognizes that plaintiff's petition relates to public policy. 313 Or at 431. Nonetheless, the majority holds that plaintiff's petition does not touch upon a matter of public concern.

[5] See discussion, *infra*.

terminated as a result of the circulation of the petition." The Court of Appeals reversed, holding that there was sufficient evidence of causation, that plaintiff's speech was a matter of public concern, and that plaintiff's petition was protected speech under the First Amendment. *Shockey v. City of Portland*, 100 Or App 166, 785 P2d 776 (1990). Defendants then petitioned this court for review, which we allowed. 310 Or 195, 795 P2d 554 (1990). The issue presented to this court as to plaintiff's § 1983 claim is whether it was proper for the trial court to direct a verdict for defendants at the conclusion of plaintiff's case in chief.

## I. 42 USC § 1983 CLAIM

### A. *Jurisdiction*

Section 1983 of the Civil Rights Act, a successor of the Civil Rights Act of 1871,[6] was enacted in response to a perceived unwillingness by states to protect their citizens' rights. *Monroe v. Pape*, 365 US 167, 180, 81 S Ct 473, 5 L Ed 2d 492 (1961), *overruled on other grounds, Monell v. Department of Social Services of City of New York*, 436 US 658, 98 S Ct 2018, 56 L Ed 2d 611 (1978). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, ___ US ___, ___, 112 S Ct 1827, 1830, 118 L Ed 2d 504 (1992) (citing *Carey v. Piphus*, 435 US 247, 254-55, 98 S Ct 1042, 55 L Ed 2d 252 (1978)). Thus, § 1983 provides direct access to a judicial forum to all individuals who claim that their constitutional or other federal rights have been violated by persons acting under color of state law. *Collins v. City of Harker Heights, Texas*, ___ US ___, 112 S Ct 1061, 1066, 117 L Ed 2d 261 (1992); *Burnett v. Grattan*, 468 US 42, 50, 104 S Ct 2924, 82 L Ed 2d 36 (1984). "State courts have concurrent subject matter jurisdiction with federal courts over § 1983 actions." *Nutbrown v. Munn*, 311 Or 328, 337, 811 P2d 131 (1991) (citing *Maine v. Thiboutot*, 448 US 1, 100 S Ct 2502, 65 L Ed 2d 555 (1980)).

### B. *Background*

As relevant to this case, § 1983 provides a remedy to a public employee who is discharged for exercising his or her

---

[6] Act of Apr. 20, 1871, ch 22, § 1, 17 Stat 13 (codified at 42 USC § 1983 (1982)).

free speech rights guaranteed by the First Amendment. *Rankin v. McPherson*, 483 US 378, 383, 107 S Ct 2891, 97 L Ed 2d 315 (1987) (citing *Perry v. Sindermann*, 408 US 593, 597, 92 S Ct 2694, 33 L Ed 2d 570 (1972)). The question then is whether a public employee's speech (here, plaintiff's petition) is protected by the First Amendment.

To determine whether a public employee's speech is protected by the First Amendment, we must consider a series of decisions by the Supreme Court of the United States which collectively suggest a method of analysis. I will discuss the relevant law in those decisions and the suggested methodology. I then will apply that methodology to this case.

In *Keyishian v. Board of Regents*, 385 US 589, 605-06, 87 S Ct 675, 17 L Ed 2d 629 (1967), the Supreme Court held that a public employer may not condition public employment on the relinquishment of First Amendment rights. In *Pickering v. Board of Education*, 391 US 563, 88 S Ct 1731, 20 L Ed 2d 811 (1968), the Court qualified that holding by stating that, although a public employee does not surrender First Amendment rights to comment on matters of public interest by virtue of government employment, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568.

In *Pickering*, the Court imposed two important limitations on a public employee's free speech rights guaranteed by the First Amendment. First, the Court suggested that false statements knowingly or recklessly made would not be protected. *Id.* at 574 and n 6. There is no contention asserted in this case that this limitation applies to plaintiff's statements in this case. Second, the Court articulated a balancing test to determine whether the speech rights asserted by public employees are protected by the First Amendment. "The problem in any case[,]" said the Court, "is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

In *Connick v. Myers*, 461 US 138, 103 S Ct 1684, 75 L Ed 2d 708 (1983), the Court fine-tuned its holding in *Pickering*. In *Connick*, the public concern test made its debut in the area of public employee speech. There, the Court held that First Amendment protection afforded to a public employee under *Pickering* extends *only* to speech addressed to matters of "public concern" and that unless the employee's speech involves a "matter of public concern," "it is unnecessary for [courts] to scrutinize the reasons for * * * discharge." *Id.* at 146. Stated slightly differently, only when the public employee engages in speech addressed to matters of "public concern" is the First Amendment implicated.[7] "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," the First Amendment does not protect that employee from termination. *Id.* at 147.

C.  *Analytical Framework to Determine Whether Public Employee Speech is Constitutionally Protected*

The Supreme Court has framed a two-prong test to determine whether a public employee's speech is protected by the First Amendment. First, the employee's speech must involve a matter of public concern. Second, the employee's First Amendment rights in commenting on a matter of public concern must not be outweighed by the public employer's interest in providing public services efficiently. Each of these requirements must be satisfied before the employee's speech is protected by the First Amendment.

1.  *Threshold Public Concern Test*

An employee's expression may be fairly characterized as constituting expression on a matter of public

---

[7] *See Mt. Healthy City School District Board of Education v. Doyle*, 429 US 274, 283-84, 97 S Ct 568, 50 L Ed 2d 471 (1977) (although untenured teacher can be dismissed for "no reason whatever," he cannot be fired for exercise of First Amendment rights).

" 'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that amendment was to protect the free discussion of governmental affairs.' *Mills v. Alabama*, 384 US [214, 218, 86 S Ct 1434, 16 L Ed 2d 484 (1966)]. 'For speech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379 US 64, 74-75[, 85 S Ct 209, 13 L Ed 2d 125] (1964)."

*Burson v. Freeman*, ___ US ___, ___, 112 S Ct 1846, 1850, 119 L Ed 2d 5 (1992).

concern when it "relat[es] to any matter of political, social, or other concern to the community," *id.* at 146, as "determined by the content, form, and context of [that expression] as revealed by the whole record." *Id.* at 147-48. In answering the question whether the employee's speech involves a matter of public concern, the court must examine for itself the statements in issue and the circumstances under which they are made to see whether they are of a character that the First Amendment protects. *Rankin v. McPherson, supra,* 483 US at 386; *Connick v. Myers, supra,* 461 US at 150 n 10. "The inappropriate or controversial character" of the expression is irrelevant to the inquiry. *Rankin v. McPherson, supra,* 483 US at 387. Whether speech concerns a matter of "public concern" is a question of law, not fact, for the Court. *Connick v. Myers, supra,* 461 US at 148 n 7.

## 2. *Pickering Balancing Test*

Even if the public employee's speech involves a matter of public concern and, therefore, passes the threshold public concern test introduced in *Connick* and, accordingly, the First Amendment is implicated, a retaliatory discharge nevertheless may not offend the First Amendment. As previously stated, the determination whether a public employer has properly discharged an employee for engaging in speech of public concern requires an application of the *Pickering* balancing test, *i.e.*, a balance between the interests of the employee as a citizen, in commenting on matters of public concern, and the interest of the governmental body as an employer, in providing public services efficiently. *Connick v. Myers, supra,* 461 US at 146; *Pickering v. Board of Education, supra,* 391 US at 568. Relevant to the balancing analysis is the manner, time, and place in which the expression is made. *Connick v. Myers, supra,* 461 US at 152. Impairment of work-place discipline and creation of disharmony with co-workers are factors to be weighed in the balance. *Rankin v. McPherson, supra,* 483 US at 388; *Connick v. Myers, supra,* 461 US at 152-53; *Pickering v. Board of Education, supra,* 391 US at 570-73. In applying the *Pickering* balancing test, a wide degree of deference will be given to the employer's assessment of such disruption, at least in situations where "close working relationships are essential to fulfilling public

responsibilities."[8] *Connick v. Myers, supra,* 461 US at 151-52. If the public employer's interest in efficiency outweighs the employee's right to freedom of expression, the employee's expression is not protected by the First Amendment.[9] If the employer's interest in efficiency does not outweigh the employee's right to freedom of expression, the expression is protected. *Rankin v. McPherson, supra,* 483 US at 392. Whether the employee's speech enjoys the protected status is a question of law for the court. *Connick v. Myers, supra,* 461 US at 148 n 7.

## D. *Causation*

If the public employee's speech is constitutionally protected, the public employee has the burden to show causation, *i.e.,* that his or her speech was a "substantial" or "motivating" factor in the discharge decision, *Mt. Healthy City School District Board of Education v. Doyle,* 429 US 274, 287, 97 S Ct 568, 50 L Ed 2d 471 (1977), *i.e.,* that one of the reasons for the discharge decision was the employee's protected speech. *See Price Waterhouse v. Hopkins,* 490 US 228, 250, 109 S Ct 1775, 104 L Ed 2d 268 (1989) (same standard in suit under Title VII of the Civil Rights Act of 1964). If the public employee carries that burden, the burden shifts to the public employer to show by a preponderance of the evidence that it had other adequate grounds for dismissal, *Mt. Healthy City School District Board of Education v. Doyle, supra,* 429 US at 287, *i.e.,* that the same adverse decision as to the public employee's employment would have been reached even in the absence of the protected speech.[10] *See Price Waterhouse v.*

---

[8] For public employee speech that touches on matters of public concern in only a most limited sense, the public employer's disciplinary action will be upheld when the employer "reasonably believe[s that the speech] would disrupt the office, undermine his authority, and destroy close working relationships." *Connick v. Myers,* 461 US 138, 154, 103 S Ct 1684, 75 L Ed 2d 708 (1983). While the test is cast in objective terms, its reasoning entails a large amount of subjectivity, as the public employer may take action based on his view of a potential for disruption. *Id.*

[9] Justice Scalia, joined by three other justices in *Rankin v. McPherson,* 483 US 378, 399, 107 S Ct 2891, 97 L Ed 2d 315 (1987) (Scalia, J., dissenting), couched the issue as whether the employer's interest in preventing the expression of such statements outweighed the public employee's First Amendment interest in making the statement.

[10] The public employer "must show that it *would* have terminated him, not that it *could* have." *Gillette v. Delmore,* 886 F2d 1194, 1198 (9th Cir 1989) (emphasis in original).

*Hopkins, supra,* 490 US at 244-45 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.) (same standard in suit under Title VII of the Civil Rights Act of 1964); *id.* at 259 (White, J., concurring in the judgment); *id.* at 276-77 (O'Connor, J., concurring in the judgment). Whether the protected speech was a substantial or motivating factor in the decision to terminate employment is a question of fact. *Stever v. Independent School Dist. No. 625,* 943 F2d 845, 851 (8th Cir 1991).[11] If the public employer "fails to purge its [discharge] decision of the 'taint' of unconstitutional motivation, that decision cannot stand." Tribe, American Constitutional Law 816 (2d ed 1988) (citing *Mt. Healthy City School District Board of Education v. Doyle, supra*).

E.   *Discussion of Key Supreme Court Decisions*

The Supreme Court's discussions in *Pickering v. Board of Education, supra, Connick v. Myers, supra,* and *Rankin v. McPherson, supra,* provide a useful background for evaluating plaintiff's claim. In *Pickering v. Board of Education, supra,* a public high school teacher was dismissed for writing a letter to a local newspaper, criticizing the way in which the Board of Education had handled bond issue proposals and its subsequent allocation of financial resources between the school's educational and athletic programs. The teacher's letter also openly criticized the superintendent of schools for attempting to prevent teachers in the district from opposing or criticizing the proposed bond issue. 391 US at 566. The Court held that the dismissal of the school teacher was an impermissible infringement on the teacher's protected speech, rejecting the notion "that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on

---

"[T]he employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another." *Price Waterhouse v. Hopkins,* 490 US 228, 246, 109 S Ct 1775, 104 L Ed 2d 268 (1989) (discussion of burden of proof in suit under Title VII of the Civil Rights Act of 1964).

[11] The sufficiency of the evidence to create an issue of fact for the jury is, of course, solely a question of law. *Stever v. Independent School Dist. No. 625,* 943 F2d 845, 851 (8th Cir 1991). In reviewing a trial court's ruling on a motion for directed verdict on insufficiency of proof, an appellate court must view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Foster v. Schnell Refrigeration Co.,* 280 Or 411, 414, 571 P2d 497 (1977).

matters of public interest." 391 US at 568. The Court framed the proper inquiry as "arriv[ing] at a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 US at 568. The statements in the letter, the Court said, addressed "issues then currently the subject of public attention, which are critical of [the teacher's] ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." 391 US at 572-73 (footnote omitted). The Court held that, "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 US at 574 (footnote omitted). Because no such showing had been made regarding the teacher's letter, the *Pickering* court held that the teacher's dismissal was impermissible under the First Amendment. *Id.* at 574-75.

In *Connick v. Myers, supra*, Myers, an assistant district attorney in New Orleans, was informed by Connick, the district attorney, that she would be transferred to prosecute cases in a different section of the criminal court. Myers objected to the transfer and, in this context, circulated a questionnaire to other employees. 461 US at 140-41. The questionnaire consisted of fourteen entries and is reprinted in the appendix to the opinion, *id.* at 155-56. Questions 1 through 5 asked employees to describe their work experience with office transfers. Questions 6 through 9 asked employees about the existence of a rumor mill and its effect on office morale. Question 10 asked for an assessment of their confidence in certain named supervisors. Question 11 asked whether employees felt pressure to work in political campaigns supported by the district attorney. Questions 12 through 14 asked whether a grievance committee was needed, whether morale in the office was good, and whether any other issues of concern to the employees needed to be addressed. *Id.* Connick accused Myers of "creating a 'mini-insurrection,' " considered the questionnaire an act of insubordination, and discharged Myers. Myers filed suit under 42

USC § 1983, contending that her employment was wrongfully terminated because she exercised her First Amendment right of free speech. *Id.* at 141. The Supreme Court disagreed. The Court held that only one entry, Question 11 — asking whether fellow staff members felt pressured to work on political campaigns on behalf of office-supported candidates — touched on a matter of public concern. *Id.* at 149. The other questions were "mere extensions of Myers' dispute over her transfer." *Id.* at 148. These questions did not concern the office's performance of its prosecutorial functions, nor did they allege any fraud or wrongdoing. According to the Court:

> "While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre."

*Id.* at 148. "[As such, these questions did] not fall under the rubric of matters of 'public concern.' " *Id.*

With respect to Question 11, the only entry that did relate to a matter of public concern — the question concerning whether staff members felt pressured to work on political campaigns — the Court applied the *Pickering* balancing test and struck the balance for the public employer. *Id.* at 149. That is, the isolated statement (Question 11) was afforded protection to the point of requiring the *Pickering* balancing, even though the statement was only one of 14 entries and could arguably be called a pretext for and motivated by the basically personal grievance. According to the Court, despite the "limited First Amendment interest involved," Myers' supervisor was justified in discharging Myers based on speech that he "reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships[,]" *id.* at 154, even absent any evidence of actual disruption. Myers' discharge did not, therefore, offend the First Amendment. *Id.*

In *Rankin v. McPherson, supra*, the firing of a data-entry employee (deputy county constable) for privately

remarking to a co-worker (who happened to be her boy-friend), after hearing of an assassination attempt on President Reagan, "if they go for him again, I hope they get him," 483 US at 381, was held to violate the employee's right of free speech under the First Amendment to the federal constitution. The Court held that the data-entry employee's remark, taken in context, constituted a matter of public concern, since it was made in the course of a conversation concerning the policies of the President's administration and came on the heels of a news bulletin regarding a matter of heightened public attention, and was protected by the First Amendment.[12] *Id.* at 386. The Court stated that the constable did not demonstrate that the state interest justified firing the data-entry employee: she had purely clerical duties and no law enforcement duties; the statement was made privately in a room not readily accessible to the public; and there was no evidence that the employee's statement had discredited her office or interfered with its efficient functioning. *Id.* at 388-89, 392.

F.  *Application of Analytical Framework to This Case*

1.  *Threshold Public Concern Inquiry*

Turning to the first requirement of the two-prong test to determine whether a public employee's speech is protected by the First Amendment, I agree with the Court of Appeals that plaintiff's petition does involve a matter of public concern. As previously stated, speech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected, *Connick v. Myers, supra,* 461 US at 146, as determined by the content, form and context of that expression as revealed by the whole record. *Id.* at 147-48.

a.  *Content*

Except for the first two sentences of plaintiff's petition, the *content* of plaintiff's petition addresses issues involving public health and safety. Omitting the first two sentences, plaintiff's petition reads:

---

[12] In contrast, an actual threat to kill the President would not be protected, the Court said. *Rankin v. McPherson, supra,* 483 US at 386-87.

> "[I]f everyone on site is to be available in a chlorine emergency, the questions of fit, maintenance and hygiene of the respirators, the supplying of respirators for those who wear glasses, training of all employees in their use, hazard pay, and the availability of respirators for office staff, contractors' employees and visitors must be answered. The aforementioned proposed rules do not take into account the use of respirators by the last three mentioned groups.

> "It would be far more practical to have a volunteer crew, specially trained and outfitted to deal with chlorine in emergency and non-emergency situations."

How the majority concludes that this language does not involve a matter of public concern[13] bewilders me.

The thrust of all but the first two sentences of plaintiff's petition addresses the practicability and adequacy of the proposed governmental work safety rules and regulations in protecting employees and other members of the public who could be exposed to a chlorine gas leak. In particular, the petition states that the proposed rules did not address the "fit, maintenance and hygiene of the respirators," "training of all employees in their use," and whether "office staff, contractors' employees and visitors" would be required to wear respirators. The petition suggested an alternate solution for dealing with chlorine gas, a lethal substance, in emergency and non-emergency situations. The content of the speech in plaintiff's petition, therefore, went beyond plaintiff's personal employment concern (his desire to retain his beard), and expressed concern about health and safety in the work place and particularly about the protection afforded to employees and other members of the public from a chlorine gas leak. Plaintiff's petition, in essence, states that the proposed city rule for dealing with a lethal substance on city property was inadequate to protect large groups of employees and other members of the general public.

Speech by a public employee about public health and safety is clearly speech on a matter of public concern. In *Caldwell v. City of Elwood, Ind.*, 959 F2d 670, 672 (7th Cir 1992), a firefighter's statements to the mayor at the mayor's

---

[13] 313 Or at 429-31.

home discussing his (firefighter's) safety and employer's concerns regarding the fire department's use of ambulances are, the court said, "certainly a matter of public concern." In *Burgess v. Pierce County*, 918 F2d 104, 105-06 (9th Cir 1990), a county fire marshall's statements to county officials and members of the public that passage and enforcement of county ordinances would conflict with state fire flow and private road standards, threaten life and property, and expose the county to potential tort liability were held to be a matter of public concern. In *Considine v. Board of County Com'rs*, 910 F2d 695, 700 (10th Cir 1990), a county employee's statements that alleged that numerous statutory and regulatory public health and safety violations were occurring on projects that were sponsored by the county and under the direction of the county's elected officials and administrative staff were held to involve a matter of public concern and were entitled to First Amendment protection. In *Morfin v. Albuquerque Public Schools*, 906 F2d 1434, 1437-38 (10th Cir 1990), a public school teacher's criticism of a superior's disciplinary philosophy was recognized as speech on a matter of public concern because "[g]enerally, speech by a public school employee about a policy or practice which can substantially and detrimentally affect the welfare of the children attending the school constitutes speech on a matter of public concern." In *Finch v. City of Vernon*, 877 F2d 1497, 1502 (11th Cir 1989), the court held that a police chief's "[w]arning [to the city council] that closing a public road would create a safety hazard is speech on a matter of public concern." In *Price v. Brittain*, 874 F2d 252, 258 (5th Cir 1989), a state mental health facility social worker's statements to patients regarding their right to outside legal counsel and to prosecute civil actions against officials within the facility who were mistreating them were held to be a matter of public concern. In *Frazier v. King*, 873 F2d 820, 825-26 (5th Cir 1989), a nurse's report to superiors of violations of nursing practices in the prison infirmary which endangered the prisoners was held to be a matter of public concern. In *Gillette v. Delmore*, 886 F2d 1194, 1197-98 (9th Cir 1989), a firefighter's comments to his supervisor and other city workers criticizing the behavior of other firefighters and police officers in their handling of a drug overdose case were held to be speech about a matter of public concern. In *Teeters v. Scott*, 733 F Supp 1279, 1281-83 (ED Ark 1990), a nurse's comments to a

mother of a patient that the patient was occasionally deprived of meals and bathroom privileges, and that hospital personnel were being mean to the patient, were a matter of public concern because they concerned the standard of care given a patient at a public institution. In *Brown v. Port Authority of New York and New Jersey*, 656 F Supp 517 (EDNY 1987), *aff'd without opinion*, 867 F2d 1424 (2d Cir 1988), a lieutenant in the security force assigned to JFK Airport was disciplined following his writing a memo to his superiors and his union in which he expressed the view that airport security was not sufficient to repel terrorist activity. Although the memo addressed plaintiff's personal safety concerns, noted the court, the memo essentially concerned the ability of the airport to respond to a matter of utmost public concern — terrorism. *Id.* at 521. In *Woodruff v. Bd. of Tru. of Cabell Huntington*, 319 SE2d 372, 378-379 (W Va 1984), hospital employees' distribution near the hospital of leaflets disclosing a labor dispute with the hospital and the effects of job eliminations on the level of public health care was held to be speech on a matter of public concern.

Additionally, the Oregon Legislative Assembly has recognized that speech which discloses information on matters of public health and safety is of public import. ORS 659.510(1)(b)(B) prohibits a public employer from taking or threatening to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of "substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision." One purpose of the Oregon Safe Employment Act, ORS 654.001 to 654.295, ORS 654.750 to 654.780, and ORS 654.991, is to "assure as far as possible safe and healthful working conditions for every working man and woman in Oregon." ORS 654.003. To accomplish that purpose, the Legislative Assembly provides a procedure that "[e]ncourage[s] employers and employees to reduce the number of occupational safety and health hazards and to institute new programs and improve existing programs for providing safe and healthful working conditions." ORS 654.003(1). Under ORS 654.062(5)(a), it is an unlawful employment practice for an employer "to bar or discharge from employment or otherwise discriminate against any employee or prospective employee" who "opposed any

practice forbidden by [health and safety laws]" or who "made any complaint or instituted or caused to be instituted any proceeding under [the health and safety laws]."

### b. *Form*

As to the *form* of plaintiff's expression, plaintiff's petition was "posted on the company bulletin board," given to the city commissioner in charge of the Bureau of Environmental Services, and circulated among employees affected by the policy. The fact that plaintiff's speech was not directed to the public at large, to inform it of the perceived problems, is not determinative to the inquiry whether the speech involves a matter of public concern. *See Rankin v. McPherson, supra,* 483 US at 386 n 11 ("The private nature of the [public employee's] statement does not * * * vitiate the status of the statement as addressing a matter of public concern."); *see also* McGowan and Tangri, *A Libertarian Critique of University Restrictions of Offensive Speech,* 79 Cal L Rev 825, 855 (1991) (*"Rankin* demonstrates that the concept of public speech has a very strong content base − the speech at issue was not distributed in anything remotely resembling a public fashion."); *Gillette v. Delmore, supra,* 886 F2d at 1198 (a public employee's speech was held to involve a matter of public concern, even though made to employee's supervisor and other city workers and not to the public at large).

### c. *Context*

Taken in *context,* I will assume that plaintiff's petition arose because of plaintiff's personal dissatisfaction with the proposed work safety policy. A motive of personal concern behind a public employee's speech is not, however, dispositive on the issue whether the employee's speech involves a matter of public concern. *Breuer v. Hart,* 909 F2d 1035, 1038-39 (7th Cir 1990); *Belk v. Town of Minocqua,* 858 F2d 1258, 1264 (7th Cir 1988). *Content,* not context as stated by the majority,[14] is

---

[14] The majority's analysis is premised on the notion that context is the most important factor and, in this case, the determinative factor, in determining whether something is a matter of public concern. 313 Or at 428-29. The majority admits that plaintiff's petition relates to public policy, 313 Or at 430-31, but refuses to consider it a matter of public concern because of the context in which it was presented. This analysis is fundamentally flawed. In *Connick,* the context was clearly stated by the Court to be a personal grievance, *i.e.,* "one employee's [Myers'] dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre." 461 US at 148.

the most important factor in the inquiry whether the public employee's speech passes the threshold public concern test. *Breuer v. Hart, supra,* 909 F2d at 1039; *Belk v. Town of Minocqua, supra,* 858 F2d at 1264; *Berg v. Hunter,* 854 F2d 238, 242-43 (7th Cir 1988), *cert den* 489 US 1053, 109 S Ct 1314, 103 L Ed 2d 583 (1989); Bodensteiner and Levinson, 1 State & Local Government Civil Rights Liability 77, § 1:08.50 (1987); McGowan and Tangri, *supra,* 79 Cal L Rev at 855.

. In *Connick v. Myers, supra,* the Supreme Court considered one of Myers' thirteen questions — the question regarding pressure to work in political campaigns — to be of public concern, even though the Court found that Myers' grievances were fairly rooted in a personal dispute over her transfer. The fact that a "speaker was motivated by narrow self-interest" does not automatically mean that the issue is not of public concern. *Breuer v. Hart, supra,* 909 F2d at 1038-39; Bodensteiner and Levinson, *supra. Connick* makes clear that a public employee's statements motivated, triggered, or predominated by a personal grievance, dissatisfaction, or narrow self-interests may nevertheless involve matters of public concern necessitating inquiry as to whether the employee's (plaintiff's) speech passes the second requirement of the two-prong test to determine whether the speech is protected by the First Amendment, namely, the *Pickering* balancing test. The fact that plaintiff's speech arose in the context of what began as a personal dispute does not, therefore, in itself disqualify that speech from constitutional protection.

In sum, as determined by the content, form, and context of plaintiff's expression as revealed by the whole record, I conclude that, despite whatever self-interests motivated or triggered plaintiff to circulate the petition, all but the first two sentences of plaintiff's petition concerns a matter of public concern.

## 2. *Application of Pickering Balancing Test*

Having determined that the speech in plaintiff's petition involves a matter of public concern, the court must

---

*If context was the most important factor in determining whether the speech was a matter of public concern, what caused the Court to conclude that Question 11 was a matter of public concern?* Even though Question 11 was presented in the context of thirteen other entries relating to a private grievance, it was found to be a matter of public concern *because, notwithstanding its context (personal grievance) and form (circulated only to other employees), its content established it to be so.*

balance plaintiff's First Amendment interest in commenting on a matter of public concern against the interest of the city, as an employer, in promoting the efficiency of the public services it performs through its employees. *Rankin v. McPherson, supra,* 483 US at 388-91. At the time that the trial court directed the verdict for defendants, the record did not support a finding that a legitimate city interest justified firing plaintiff. I find no evidence in the record that plaintiff's petition interfered with the city's interest in the effective and efficient fulfillment of its responsibilities to the public. Nothing in the record indicates that the circulation of plaintiff's petition impaired work-place discipline or created disharmony with co-workers. Nor does the record disclose any evidence that plaintiff's superiors reasonably believed that plaintiff's speech would disrupt the operation of the wastewater treatment plant where plaintiff worked, undermine his superior's authority, or destroy close working relationships. Like *Rankin v. McPherson, supra,* there was no evidence that plaintiff's statements had discredited the city or interfered with its efficient functioning.[15] Similarly, there is no evidence that plaintiff's petition was circulated in an inappropriate time, place or manner. Absent any particularized evidence of defendants' interests in this case, I must conclude that, based on the record the trial court had before it when it directed the verdict, the employer's (city's) interest in efficiency does not outweigh the employee's (plaintiff's) freedom of expression. Without such a showing, plaintiff's First Amendment rights predominate. I conclude, therefore, that defendants were not entitled to a directed verdict on the issue whether plaintiff's petition is protected speech under the First Amendment to the federal constitution.

## G. *Causation Determination*

Having determined that defendants were not entitled to a directed verdict with respect to the question of

---

[15] In fact, the city made no claim that plaintiff's petition disrupted the wastewater treatment plant, destroyed close working relationships with supervisors or fellow employees, or constituted insubordination.

As previously stated, the city's Civil Service Board found that, in violation of the city's charter, the decision to discharge plaintiff was not made in good faith for the purpose of improving public service. Defendants did not challenge the propriety of that finding.

whether plaintiff's petition is protected by the First Amendment, I review the evidence to determine whether it is sufficient on the causation issue. If so, the trial court erred in entering a directed verdict for defendants. If there was insufficient evidence to establish causation, the trial court correctly granted the defendants' motion for directed verdict. In determining the propriety of the trial court's directing the verdict, this court views the evidence in the light most favorable to the non-moving party (in this case, plaintiff), who is entitled to the benefit of every reasonable inference that may be drawn from the evidence. *Foster v. Schnell Refrigeration Co.*, 280 Or 411, 414, 571 P2d 497 (1977).

The evidence would permit a trier of fact to find that plaintiff's supervisors, Irvin and Lang, were hostile toward plaintiff's attempt to receive an exemption from the challenged policy. Other employees testified that management retaliated against employees who spoke out against management practices or on safety issues by firing them. Lang admitted that plaintiff's petition made him angry and caused him some anxiety. Irvin admitted that he did not help plaintiff find other comparable city employment before terminating him, although he had assisted other employees who did not comply with the facial hair policy.[16] While plaintiff had no proof to spare, the foregoing evidence, when combined with the reasonable inferences that can be drawn therefrom, was sufficient to allow a trier of fact to conclude that plaintiff's speech was a "substantial" or "motivating" factor in defendants' discharge decision. There is no evidence in the record to show by a preponderance of the evidence that defendants had other adequate grounds for dismissal, *i.e.*, that the same adverse decision to plaintiff's employment *would* have been reached even in the absence of the protected speech. It was error, therefore, for the trial court to grant defendants' motion for directed verdict on plaintiff's § 1983 claim.

## II. CONCLUSION

For the foregoing reasons, I would remand this case

---

[16] Contrary to defendants' assertions, defendants did not object to the testimony supporting the foregoing summary, and the evidence was not excluded by the circuit court.

to the circuit court for proceedings not inconsistent with this opinion.[17]

Van Hoomissen and Fadeley, JJ., join in this opinion.

---

[17] The Court of Appeals concluded that "[p]laintiff's petition was constitutionally protected." *Shockey v. City of Portland*, 100 Or App 166, 170, 785 P2d 776 (1990). To the extent that that conclusion forecloses defendants from demonstrating to the trial court that plaintiff's petition is not protected by the First Amendment as a result of the application of the *Pickering* balancing test, I disagree.