Argued and submitted September 14, affirmed in part, otherwise reversed and remanded on appeal; reversed and remanded on cross-appeal December 13, 1995

John R. BUTLER,
*Respondent - Cross-Appellant,*

*v.*

STATE OF OREGON
DEPARTMENT OF CORRECTIONS,
Carl Zenon, Richard Peterson
and Dallas Robinson,
*Appellants - Cross-Respondents.*

(90C-10919; CA A81353)

909 P2d 163

Richard D. Wasserman, Assistant Attorney General, argued the cause for appellants - cross-respondents. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Kathryn T. Whalen argued the cause for respondent - cross-appellant. With her on the briefs were Amy R. Kent and Bennett & Hartman.

Before Warren, Presiding Judge, and Leeson and Haselton,* Judges.

WARREN, P. J.

* Haselton, J., *vice* Edmonds, J.

## WARREN, P. J.

Defendants[1] appeal a second amended judgment for noneconomic, economic, and punitive damages in favor of plaintiff. They assign as error the failure of the trial court to give their requested jury instruction No. 7. Defendants also assign error to the trial court's order designating the judgment *nunc pro tunc* to the date of the original judgment and ordering that interest on the damages awarded to plaintiff accrue from the date of entry of the original judgment and not from the date of entry of the second amended judgment. Plaintiff cross-appeals from the order directing a verdict dismissing all claims against defendant Dallas Robinson, from the dismissal of his claim under 42 USC § 1983, from the judgment in favor of all defendants on his claim under ORS 654.062, from the order excluding the testimony of an expert witness, and from the denial of a motion for entry of judgment deleting the Oregon Department of Justice as a judgment creditor.

In January 1989, plaintiff was working at the Oregon State Correctional Institution (OSCI) as a corrections officer. He had become concerned about what he considered to be a potentially dangerous overcrowding situation in "Unit 13." On at least one occasion, he approached his supervisors, defendants Peterson and Zenon, regarding the overcrowding. According to plaintiff, Peterson responded by requesting him to draft a memo stating that Unit 13 could contain no more than 110 inmates at one time. On January 19, 1989, Zenon, the superintendent of OSCI, was out of the state and defendant Robinson was acting superintendent in Zenon's absence. Robinson ordered the acting security manager, Ralph Bradford, to make room for approximately 25 bunk spaces for incoming inmates. Bradford informed plaintiff that they needed to add more bunk beds for additional inmates in "Unit 13." The parties dispute whether Bradford's communication was an order to plaintiff to assist Bradford in finding bedspace in Unit 13, or whether Bradford was simply informing plaintiff of the order Robinson had given to him. Plaintiff asked Bradford if he and Robinson were aware of a directive that Unit 13 could contain no more

---

[1] At the time of the alleged wrongdoing, the individual defendants were all employees of the Oregon Department of Corrections (ODOC).

than 110 inmates, and Bradford replied that he was. Plaintiff then contacted the Accident Prevention Division (APD)[2] to report the overcrowding situation in Unit 13. He then reported his contact with APD to Robinson. Robinson called Peterson, then the acting director of the Department of Corrections, regarding plaintiff's actions and asked Peterson what he should do. Peterson said that he could either suspend plaintiff's employment with pay or wait until Zenon returned to address plaintiff's conduct. Robinson contacted Zenon and told him about plaintiff's actions. Zenon instructed Robinson to suspend plaintiff's employment with pay, which Robinson did. Plaintiff was thereafter transferred to another correctional facility and resumed his employment there.

Plaintiff later sued defendants, alleging that all defendants had committed unlawful employment practices under ORS 654.062[3] and ORS 659.035,[4] that all defendants had violated his First Amendment rights under 42 USC § 1983, and that Zenon, Peterson and Robinson had intentionally interfered with his economic relationship with the State of Oregon. The First Amendment claim and the claim of intentional interference with an economic relationship were tried to a jury. However, the court granted defendants' motions to withdraw the First Amendment claim. The court also granted Robinson's motion for a directed verdict dismissing the claims against him. ORCP 60. As a result, the jury only deliberated on the intentional interference claims against Zenon and Peterson. It found in favor of Zenon and against Peterson and awarded compensatory and punitive damages against Peterson. The court tried the statutory claims without a jury. It held for plaintiff under ORS 659.035(3) (whistle blower statute) and awarded compensatory damages; it held for all defendants on the ORS 654.062 (work place safety) claim. On August 31, 1993, the trial court entered a document entitled "Judgment," that purported to

---

[2] The APD was renamed the Oregon Occupational Safety and Health Division (OR-OSHA) on October 1, 1989.

[3] ORS 654.062 makes it unlawful for any person to discriminate against an employee because the employee has made a complaint about a safety or health standard in a place of employment.

[4] ORS 659.035 makes it unlawful employment practice to retaliate against an employee for the reason that the employee has in good faith "blown the whistle" on a public employer.

dispose of all claims before the court. The judgment awarded $50,000 in compensatory damages and $25,000 in punitive damages against Peterson and $15,000 in compensatory damages against all defendants except Robinson. It then provided, pursuant to ORCP 70 A, that the Department of Justice was the judgment creditor for one half of the punitive damage award on behalf of the Criminal Injuries Compensation Account. ORS 18.540.

Defendant Peterson appeals from the judgment against him on the intentional interference claim. Plaintiff appeals from the judgments in favor of all defendants on the First Amendment claim and the statutory claim under ORS 654.062. We reverse the judgment against Peterson on the intentional interference claim and remand for a retrial against Peterson. We reverse the dismissal of the First Amendment claim as to all defendants and reverse the judgment in favor of all defendants on the claim under ORS 654.062.

■ We first address plaintiff's assignment of error to the trial court's grant of a motion for a directed verdict dismissing all claims against Robinson.[5] Defendants contend that

"the undisputed evidence showed that Mr. Robinson had merely followed Mr. Zenon's order to send plaintiff home * * *, and thus bore no legal responsibility for the challenged personnel actions."

Their sole contention is that because Robinson acted on the orders of his superiors, he cannot be responsible for any actions taken against plaintiff. *Restatement (Second) of Agency* § 343 (1958) states:

"An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed."

Plaintiff's claims are tort claims. Robinson would not be relieved from liability solely because he was following his

---

[5] The claims against Robinson include the intentional interference claims, the First Amendment claim, and the two statutory claims.

employer's instructions.[6] There is no evidence that any of the exceptions to the *Restatement* apply to this case. Thus, the trial court erred when it granted defendants' motion for a directed verdict dismissing all claims against Robinson. Due to our disposition of the intentional interference claims, we conclude that Robinson must be included in the retrial of all the claims which are subject to our remand.

■ In the first assignment of error, defendant Peterson argues that the trial court erred when it refused to give defendant's requested jury instruction No. 7, regarding the intentional interference claim.[7] The requested instruction said:

"In order to prevail upon his claim of Intentional Interference with Business Relationship against Defendants Zenon, Peterson and Robinson, plaintiff must establish that they were acting outside the course and scope of their duties as agents of the Department of Corrections, and either acted on some improper, personal motive unrelated to their role with the Department of Corrections, or employed some improper means, with the intent to injure plaintiff.

"You must find in favor of Defendants Zenon, Peterson and Robinson on this claim if you find that they were at all times acting within the scope of their authority, for the benefit of the Department."

Instead, the trial court instructed:

"[P]laintiff's claim is for intentional interference with his employment contract. * * * To recover damages for intentional interference with a contract, plaintiff must prove each of the following elements by a preponderance of the evidence:

"(1) Plaintiff had an employment contract with the Department of Corrections,

"(2) Defendants Peterson and/or Zenon intentionally interfered with that contract, and

"(3) Defendants Peterson and/or Zenon acted with the improper motive alleged by the plaintiff, and

---

[6] We do not decide what effect, if any, ORS 30.265 has on the liability of any of the individual defendants because that issue has not been raised by the parties on appeal.

[7] Because Peterson was the only one found liable on this claim, he is the only defendant assigning error to the court's refusal to give the instruction.

"(4) Defendant Peterson's and/or Zenon's interference caused damage to the plaintiff."

■ The threshold issue regarding the first assignment of error is whether Peterson's claim of error is preserved. Preservation of error serves the purpose of allowing the trial court to correct any error during the trial so that an appeal is not necessary. *See Hovey v. Davis*, 120 Or App 425, 428, 852 P2d 929, *rev den* 318 Or 26 (1993). Plaintiff argues that because defendants did not except to the jury instruction that the trial court gave, as required by ORCP 59 H, they did not preserve the issue on appeal. Peterson responds that no exception was necessary, because the requested instruction preserved the assigned error in that it "clearly and directly called" to the attention of the trial court the error in the instruction that was given. When the failure to give a requested instruction is the subject of the assignment of error, no further exception to a ruling on that issue is required if the requested instruction is directly contrary to the instruction given. *See Roberts v. Mitchell Bros.*, 289 Or 119, 129-31, 611 P2d 297 (1980) (holding that a party was not required to except to the trial court's failure to give a requested instruction when the requested instruction clearly and directly called to the attention of the trial court its error). Plaintiff counters that defendants' requested instruction did not alert the trial court to the purported error. We first look at the requisite elements for an intentional interference claim, consider the alleged error in the given instruction and then compare it with the requested instruction to see if the requested instruction clearly points out the alleged error in the instruction given.

■ In *McGanty v. Staudenraus*, 321 Or 532, 901 P2d 841 (1995), the Oregon Supreme Court reiterated the elements of the tort of intentional interference with economic relations:

"[A] plaintiff must allege each of the following elements: (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *Id.* at 535.

Generally, a party to a contract cannot be liable for interference with that contract. *Id.* at 537. Consequently, so long as an officer or employee of the contracting party acts within the scope of his or her authority intending to benefit the principal, we identify his or her actions with the contracting party. *Wampler v. Palmerton*, 250 Or 65, 75, 439 P2d 601 (1968). Therefore, when the complaint is against another employee for alleged tortious interference with the relationship between the employer and the plaintiff, the "third party" prong is met only if the factfinder determines that the employee was acting outside the scope of his or her employment. "[A]cting outside the scope of employment," in this context, necessarily means that the alleged conduct occurred outside the space and time limits authorized by the employer, that the employee was not at all motivated by a purpose to serve the employer, and that the alleged conduct was not of a type that the employee was hired to perform. *McGanty*, 321 Or at 539.

In *McGanty*, the court further concluded:

"Whether a party has acted by either an improper means or with an improper purpose is relevant, under the fourth element of the tort, *only* if that party first meets the threshold test of being a third party to the contractual relationship with which the interference allegedly has occurred." *Id.* at 540.

Peterson argues:

"Defendants' requested instruction No. 7 * * * recited an element completely absent from the instruction given by the trial court. Specifically, defendants' requested instruction would have accurately told the jury that plaintiff could prevail on his intentional interference claim only if the jury found that [defendants] acted 'outside the course and scope of their duties.' In other words, defendants must prevail if those defendants 'were at all times acting within the scope of their authority, for the benefit of the Department.' "

We agree with Peterson that the "third party" element was missing from the instruction that the court gave and that defendants clearly and directly called the trial court's attention to the error. We conclude that the issue framed by defendants' assignment of error is properly preserved, and that the failure to give defendants' instruction probably

created an erroneous impression of the applicable law in the minds of the jury, that affected the outcome of the intentional interference claim. *See Waterway Terminals v. P.S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970) (holding that unless an appellate court can fairly say that the instruction probably created an erroneous impression in the minds of the jury that affected the outcome of the case, no reversible error occurs on account of an erroneous instruction). We therefore reverse the verdict against Peterson on the intentional interference claim and remand for a retrial of that claim.

 We now turn to plaintiff's cross-appeal. Plaintiff first assigns error to the trial court's grant of a motion to withdraw from the jury plaintiff's claim under 42 USC § 1983, that all defendants violated his First Amendment rights. He argues that the trial court erred in agreeing with defendants that the communication he made to APD did not constitute protected speech. In *Connick v. Myers*, 461 US 138, 142, 103 S Ct 1684, 75 L Ed 2d 708 (1983), the United States Supreme Court stated that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Whether the kind of communication made by plaintiff to defendants is constitutionally protected involves a two-step analysis. First, we determine whether the matter is one of public concern. Second, we balance the employee's interest in his or her right to freedom of expression and the State's interest in promoting the efficiency of public services. *Id.* at 142. These questions are for the court, not a jury, to decide. *Id.* at 148 n 7. Once the plaintiff has established that the expression is constitutionally protected, he or she must then prove to the finder of fact that the expression was a motivating factor in the employer's decision to take action against him or her regarding the employment. *Mt. Healthy City Board of Ed. v. Doyle*, 429 US 274, 287, 97 S Ct 568, 50 L Ed 2d 471 (1977). If the plaintiff meets this burden, the burden then shifts to the employer to prove to the finder of fact by a preponderance of the evidence that it would have taken the same action even in the absence of the protected conduct. *Id.* at 287. In this case, because the trial court found that the speech was not protected, it did not have to consider the issues reserved for the finder of fact.

■ As to the first issue, the parties agree that the speech was one of public concern, but they disagree as to whose interest is outweighed. Defendants contend that the evidence shows that the state's interest in an efficiently run prison outweighs plaintiff's right to make a complaint to APD. They argue that they had two concerns with plaintiff's behavior. First, plaintiff's failure to obey an order at a critical time rendered him ineffective as a member of their management team and inhibited their ability to trust a person on whom they needed to rely. They point to the fact that plaintiff's complaint was made one day after the murder of the Director of the Department of Corrections and that there was a heightened sense of tension among the department officials.[8] They say that plaintiff's failure to accept Bradford's directive to acquire additional beds occurred in an area where prison inmates could have seen and that they were concerned that any appearance of a breakdown in the rapport between prison officials could inflame the inmates and cause disciplinary problems or a riot. Second, they argue that plaintiff had an obligation to notify his superiors immediately of any perceived emergency situations and that his failure to do so further inhibited their ability to trust him. Plaintiff argues that defendants have failed to show what interests were jeopardized by plaintiff's communications to APD and maintains that, because Bradford did not "order" him to respond, defendants' stated concerns are of no moment.

In *Hyland v. Wonder*, 972 F2d 1129 (9th Cir 1992), *cert den* 508 US 908, 113 S Ct 2337, 124 L Ed 2d 248 (1993), the court explained what occurs during the second step of the balancing process:

> "[It] entails a factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts coworker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office." *Id.* at 1139.

Defendants have indicated several interests that were jeopardized by plaintiff's refusal to follow an order.

---

[8] Peterson viewed the period of time as "the most critical time I can recall in Oregon Corrections other than the [1968] riot."

Nevertheless, had there been no order, defendants' concerns would be irrelevant to the balancing test we must perform. We find, however, that Bradford did request plaintiff's assistance in finding bedspace for the new inmates, and that plaintiff responded by saying that he was making a call to APD. As the parties agree, a prison setting is similar to a military setting. Plaintiff's superiors depended on him to carry out their requests in a disciplined manner. The evidence shows that plaintiff's call to APD came at a time when defendants were especially in need of plaintiff's discipline and commitment. According to uncontroverted testimony, OSCI had no choice but to accept the incoming inmates. Robinson was under pressure to find bedspace in an overcrowded prison. Plaintiff's choice of making the call instead of helping with the bedspace disrupted the routine operation of the office. All of this suggests a very strong state interest.

Nevertheless, the stronger the public interest involved, the stronger the state's proof of the harm caused by the expression must be. *Connick*, 461 US at 152. In this case, plaintiff's communication involved a very sensitive public issue. Plaintiff made the call because he believed that his superiors were ignoring an overcrowding problem that he had discussed with them before. He testified that he did not think there was anything more that he could say to Robinson and that he called APD to find out what other options were available. Furthermore, immediately upon making the call, he reported to Robinson what he had done. Even if the call did cause a disruption, the disruption was for no more than a few minutes, and defendants have failed to show what harm was caused or could have been caused by the few minutes it took for plaintiff to make his call. Nor have they shown how their confidence in plaintiff could have become so severely undermined because he failed to assist Bradford immediately in finding bedspace. Contrary to defendants' assertions, we are not convinced from the evidence that plaintiff's "insubordination" involved a complete refusal to help in any way with finding bedspace. Instead, plaintiff's actions could be understood to be an attempt to explore available alternatives to the overcrowding option. Under the circumstances, we conclude that the trial court erred in deciding that plaintiff's speech was not protected. The determination of causation is for the

finder of fact, and we therefore remand to the trial court for a jury determination on that issue.[9]

Next, plaintiff assigns error to the trial court's grant of judgment for all defendants on the claim under ORS 654.062. He argues that the trial court erred in requiring him to prove a violation of a law, regulation or standard "at OSCI or within the Oregon Department of Corrections pertaining to safety and health in Plaintiff's place of employment." He argues that he only needed to prove that he was subject to an unlawful employment practice because of his call to APD. We agree with plaintiff, insofar as he argues that he need not prove an actual violation of any law, regulation or standard. ORS 654.062(5)(a), on which plaintiff based his claim, provides:

> "It is an unlawful employment practice for any person to bar or discharge from employment or otherwise discriminate against any employee or prospective employee because such employee has opposed any practice forbidden by [the Oregon Safe Employment Act], made any complaint or instituted or caused to be instituted any proceeding under or related to [the Oregon Safe Employment Act], or has testified or is about to testify in any such proceeding, or because of the exercise of such employee on behalf of the employee or others of any right afforded by [the Oregon Safe Employment Act]."

As we understand the statute, plaintiff's call to APD must simply "relate" to the Oregon Safe Employment Act. ORS 654.003 states that the Act is intended to "assure as far as possible safe and healthful working conditions for every working man and woman in Oregon." The Act requires every employer to "furnish employment and a place of employment which are safe and healthful for employees therein * * *." ORS 654.010. Therefore, if plaintiff can establish that he suffered discrimination at his employment because he made a complaint "related to" safe and healthful working conditions, he has met the elements necessary to establish a claim under ORS 654.062(5)(a). The trial court erred in requiring plaintiff to prove an actual violation of a law, regulation or standard.

---

[9] Contrary to plaintiff's argument, the jury's determination that Peterson "acted with the improper motive alleged by plaintiff" does not determine the causation issue in favor of plaintiff as to any of the defendants. *See Mt. Healthy*, 429 US at 287.

Nevertheless, defendants counter:

> "As a technical matter, proof of a discrimination claim under this statute does not appear to require proof of an actual workplace safety violation. It does, however, plainly require that the workplace condition or practice complained of, if proven, would constitute a violation of the listed statutes. Only then is a complaint 'related to' those statutes. As noted above, uncontroverted evidence shows that since 1986, APD has taken the official position that prison overcrowding does not involve a workplace safety issue APD can regulate through occupational safety statutes and administrative rules."

We understand defendants to interpret ORS 654.062(5)(a) as protecting only those persons whose complaints relate to safety issues that APD has chosen to regulate. Defendants are wrong. The fact that APD has taken the official position that it will not regulate prison overcrowding does not mean that the issue does not relate to the Oregon Safe Employment Act. ORS 654.025(2) states that the Workers' Compensation Board[10] "*may* make, establish, promulgate, and enforce all necessary and reasonable regulations, rules, standards, orders and other provisions * * *." (Emphasis supplied.) Thus, an issue may relate to workplace safety, and therefore fall within the purview of the Oregon Safe Employment Act, and yet remain unregulated by the Board. Again, we hold that, in order to prove his claim, plaintiff needed to establish only that he was subject to an unlawful employment practice because he made a complaint related to unsafe working conditions.

 Plaintiff argues that we need not remand on this claim, because the trial court has already made the requisite findings for a safe Employment Act violation under ORS 654.062(5)(a) based on its findings for plaintiff's claim under ORS 659.035(3). Regarding that claim, the trial court found:

> "Plaintiff has established by a preponderance of the evidence, an unlawful employment practice by Defendants, as Plaintiff's employers, against Plaintiff by taking retaliatory and disciplinary action for disclosure of information that

---

[10] The director of the Workers' Compensation Board has directed APD (currently the Oregon Occupation Safety and Health Division) to promulgate the rules for the administration of the Oregon Safe Employment Act. *See* OAR 437-01-005.

Plaintiff reasonably believed was evidence of substantial and specific danger to *public* health and safety." (Emphasis supplied.)

Under ORS 659.035(3), one may receive compensatory damages if one can prove that a public employer violated ORS 659.510. ORS 659.510 provides, in pertinent part:

"(1) * * * no public employer shall:

"* * * * *

"(b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"* * * * *

"(B) Mismanagement, gross waste of funds or abuse of authority or *substantial and specific danger to public health and safety* resulting from action of the state or agency or political subdivision * * *." (Emphasis supplied.)

Public safety concerns and workplace safety concerns are discrete issues. Thus, disclosure of a public safety concern under ORS 659.510 is not the same as complaint of a workplace safety concern under the Oregon Safe Employment Act. We conclude that the trial court has not made the requisite findings for plaintiff's claim under ORS 654.062(5)(a). Therefore, we remand to the trial court to reconsider this claim.

■ Plaintiff next assigns error to the trial court's exclusion of the testimony of an expert witness. At trial, plaintiff offered the testimony of an expert on the types of harm that most whistleblowers suffer, particularly when the whistleblower is a part of a para-military organization that has an established chain of command. Defendants objected on the grounds that the testimony would not assist the jury in determining plaintiff's damages. They argued that plaintiff would provide his own testimony regarding his damages, and that the expert's testimony regarding other whistleblower situations was an "extremely collateral inquiry." The trial court agreed and sustained the objection. Plaintiff then made an offer of proof, in which the expert testified about the common profile of a whistleblower, that most whistleblowers suffer severe organizational retaliation, and that most suffer long-term stigmatization to their vocational reputations.

In *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), the court explained that the admissibility of expert testimony is governed by three constraints. It must be relevant under OEC 401,[11] it must provide assistance to the trier of fact under OEC 702,[12] and it must not be unduly prejudicial, repetitive, or fall under some other exclusionary provision under OEC 403.[13] *Id.* at 408-09. The court said:

> "[T]his court must identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission." *Id.* at 409.

The trial court reasoned that the evidence would not assist the trier of fact under OEC 702, stating:

> "I think at this juncture you're asking me to decide whether or not the trier of fact — on whichever issue, the court issue or the jury issues, that the triers of fact have no particular fitness to draw inferences on damages in this case. And I disagree with that.
>
> "* * * * *
>
> "I don't know that we need, necessarily, or require here an expert to draw the inferences from his studies that aren't based on the factual experience here, they're based upon other factual experiences. And so that would require me to say that the expert is better prepared than the average trier of fact here to form an opinion from the facts. And I can't say that."

[11] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[12] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[13] OEC 403 provides:

"Although relevant, evidence may be exluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

■ Plaintiff argues that the testimony would assist the jury in understanding the "unique damages" that he suffered. However, the testimony lacked any real specificity to plaintiff's situation. Moreover, plaintiff offered specific testimony about his actual damages. When it is doubtful, as in this case, whether the testimony will assist the factfinder, or if the issue reasonably could be decided either way, we will affirm the trial court's decision either to admit or exclude the evidence. *State v. Stringer*, 292 Or 388, 394, 639 P2d 1264 (1982). We conclude that the trial court did not abuse its discretion in excluding the testimony.

Plaintiff next assigns error to the trial court's denial of his motion for entry of judgment deleting the Oregon Department of Justice as judgment creditor on one-half of the punitive damages award. Because we have found error in the jury instructions, requiring a new trial on the intentional interference claim against Peterson, we need not consider this issue.

■ Because our decision leaves intact plaintiff's money judgment on the claim under ORS 654.062, we consider defendants' second assignment of error regarding the entry of the final judgment. The facts regarding this assignment of error are as follows: On October 26, 1994, after defendants had filed a notice of appeal, this court issued an order granting leave under ORS 19.033(4) for entry of a corrected judgment. That order provided, in relevant part:

> "The court determines that when the judgment was entered, the trial court intended to finally dispose of all claims in the case. Therefore, in lieu of dismissing the appeal for lack of a final judgment, and pursuant to ORS 19.033(4), the court gives the trial court leave on motion of any party to enter a corrected judgment disposing of [plaintiff's second claim against Zenon or Robinson and plaintiff's third claim against Robinson and identifying Robinson as a party to this case]."

On January 12, 1995, the trial court signed a "Second Amended Judgment" and designated it as "*nunc pro tunc* as of August 31, 1993," providing that interest on the money judgment shall accrue from the date of the original judgment (August 31, 1993). Defendants argue that the trial court erred in designating the judgment *nunc pro tunc* to August

31, 1993, and in ordering that interest on the judgment should accrue from that date. They contend that interest on the judgment accrues only from the date of entry of a final judgment and that, because the original judgment did not dispose of all of the claims, the judgment was not final until the trial court signed and entered the amended judgment on January 12, 1995. They argue that interest did not begin to accrue until that date and that the trial court exceeded its authority in designating the amended judgment *nunc pro tunc* to August 31, 1993. Plaintiff responds that the trial court was within its authority to enter the amended judgment *nunc pro tunc* because the amended judgment merely supplied an omission in the judgment that was left out due to inadvertence or mistake and the omission did not affect the money judgments.

 Generally, "[i]nterest on a judgment * * * accrues from the date of the entry of the judgment unless the judgment specifies another date." ORS 82.010(2)(a). An order that adjudicates fewer than all of the claims of all of the parties does not terminate the action with respect to any of the claims or parties and cannot be a final judgment except by express determination by the trial court upon making specified findings. ORCP 67 B.[14] In *Gow v. Multnomah Hotel, Inc.*, 191 Or 45, 224 P2d 553, 228 P2d 791 (1951), the Oregon Supreme Court considered whether a trial court could grant judgment *nunc pro tunc* to the date of a jury verdict, so that interest could accrue from the date of the jury verdict. In *Gow*, the jury returned a verdict for the plaintiff, and the trial

[14] ORCP 67 provides:

"A. 'Judgment' as used in these rules is the final determination of the rights of the parties in an action; judgment includes a decree and a final judgment entered pursuant to section B or G of this rule. * * *

"B. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

court granted judgment notwithstanding the verdict to the defendants and entered judgment accordingly. The court reversed and remanded the cause with instructions to enter judgment for the plaintiff. The plaintiff then filed a petition, requesting the court to direct the trial court to enter judgment *nunc pro tunc* to the date of the jury's original verdict. The defendant argued that the claim could not bear interest until the entry of a final judgment in favor of the plaintiff and that a judgment had never been entered. The applicable statute regarding accrual of interest was similar to current ORS 82.010(2)(a).

The court first reviewed applicable case law regarding *nunc pro tunc* orders and held that, in each case, the "fact" of judgment had occurred, either by the court's rendering of a judgment, by an actual entry of judgment, or by operation of law. For instance, in *Compton v. Hammond Lumber Co.*, 153 Or 546, 55 P2d 21, 58 P2d 235, *on motion to modify* 154 Or 650, 61 P2d 1257 (1936), the trial court had entered judgment in favor of the plaintiff. On appeal, the Supreme Court reversed the judgment and remanded for a new trial. On a petition for rehearing, the court reversed its decision awarding the new trial, and ordered "a judgment [to be] rendered in favor of [the] plaintiff [in accordance with the original judgment]." 153 Or at 564. In a later motion to modify, the court also ordered the trial court to date the judgment *nunc pro tunc* to the date of the original judgment. Similarly, in *City of Portland v. Blue*, 87 Or 271, 170 P 715 (1918), the jury had rendered a verdict in favor of plaintiff, but no judgment had been entered. After an appeal had been taken and determined, the parties discovered that the court had never entered judgment. The trial court entered judgment *nunc pro tunc* to the date of the jury verdict over the protest of the defendant. The court noted that a statutory provision required that the trial court enter judgment in accordance with the jury verdict and required the clerk to enter the judgment within the day on which the verdict was returned. The court concluded that since the law required the entry of judgment, the trial court had the authority to enter judgment *nunc pro tunc* to the date of the verdict. *Id.* at 273.

In contrast, in *Sorenson v. Oregon Power Co.*, 47 Or 24, 82 P 10 (1905), the court held that the trial court erred

when it awarded interest from the date of the verdict (after reducing the jury award from $15,000 to $9,450). The court noted that the applicable statute did not authorize the accrual of interest on the date that the verdict was rendered. *Id.* at 34. In each case, the key was whether a judgment had occurred in fact or by operation of law. The *Gow* court concluded:

> "[I]t is clear that the amendment to the interest statute was not intended to authorize interest from a date previous to the rendition of judgment by the court. We agree with the contention of the plaintiff only to this extent; that the amended statute does indicate a legislative intent that the actual date of the ministerial entry of judgment or decree would not be controlling if the court had in fact pronounced judgment previous to its entry. * * *
>
> "We adhere to the rule announced in *Ryan's Estate*, 84 Or 102, 164 P 586, that 'The sole purpose of a *nunc pro tunc* order is to make the record speak the truth never to falsify it.' * * * We conclude that in actions of this kind, a *nunc pro tunc* order should be made only to make the record conform to fact * * *." *Gow*, 191 Or at 73-74.[15]

Therefore, because no judgment for the plaintiff had ever been entered either in fact or by operation of law, a *nunc pro tunc* order was not authorized.

In this case, the August 31, 1993, "judgment" was not final, because it failed to refer to Robinson and did not dispose of all of the claims against all of the parties. All the claims and defenses of all parties remained subject to revision under ORCP 67 B. Thus, the "fact" of judgment had not occurred, and the trial court erred in designating the amended judgment *nunc pro tunc* August 31, 1993.

On appeal, judgment on ORS 659.035(3) claim affirmed with interest to accrue from January 12, 1995; otherwise reversed and remanded; on cross-appeal, reversed and remanded.

---

[15] In *Turlay v. Farmers Insurance Exch.*, 259 Or 612, 615-16, 488 P2d 406 (1971), the court reiterated that the purpose of a *nunc pro tunc* order is to supply an omission in the record of action actually had but omitted through inadvertence or mistake, not to supply an omitted action or to make an order now for then.