Argued and submitted June 2, affirmed October 12, 2005

Dennis BJURSTROM,
*Appellant,*

*v.*

OREGON LOTTERY,
David Kunz, Debbie Jones,
Allen Stewart, Ryan Fleming, and Bill Taylor,
*Respondents.*

03C-10887; A124915

120 P3d 1235

William D. Stark argued the cause and filed the briefs for appellant.

Denise Fjordbeck, Assistant Attorney General, argued the cause for respondents. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Edmonds* and Schuman, Judges.

SCHUMAN, J.

_____
* Edmonds, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

Plaintiff brought this action against his employer, the Oregon Lottery (Lottery), and several of its managers, alleging violations of the Oregon Public Employee Whistle-blower Law (Whistleblower Law), ORS 659A.203 to 659A.236, and the federal Civil Rights Act, 42 USC section 1983. Plaintiff claimed that he was terminated from his position as a video support technician in retaliation for making intra-agency complaints on matters of agency policy and practice. The trial court granted defendants' motion for summary judgment. Plaintiff appeals. Because we conclude that none of the statements in retaliation for which plaintiff claims he was terminated was protected by state or federal law, we affirm.

## I. FACTUAL BACKGROUND

The following facts are undisputed. Plaintiff, who characterizes himself as something of a gadfly, became concerned about certain management and personnel issues in the workplace and repeatedly voiced his opinions about them to his coworkers and supervisors. Relevant to this action, he spoke out about four issues: (1) Lottery's policy on the personal use of company-purchased safety shoes; (2) a Lottery manager's alleged harassment of a coworker; (3) Lottery's policy regarding what plaintiff regarded as excessive breaks by managers and the sale of decommissioned ladders; and (4) Lottery's human resources department's alleged incompetence. In what follows, we summarize plaintiff's expression with respect to each subject.

Lottery purchased safety shoes and required certain employees to wear them at work. To minimize wear and tear, it prohibited the employees from using the shoes outside the workplace. As a consequence, employees were required to put on the shoes at the beginning of the workday and remove them at the end. Plaintiff objected staunchly to that policy on the grounds that it was paternalistic and wasted time during the workday. He reported his concern directly to his supervisor, Newton. Newton did not create an exception for plaintiff, but instead indicated that employees would continue to adhere to the shoe policy.

Plaintiff also objected to allegedly disparaging remarks that Newton made in 2002 to a coworker concerning that coworker's height. Plaintiff reported the remarks to Lottery's human resources department, and shortly thereafter, Newton ceased working for Lottery, because he was either dismissed or asked to resign.

At a meeting in October 2001, after managers cautioned line employees about taking longer breaks than allowed under state regulations, plaintiff complained that managers, too, should have limited breaks. Plaintiff was told that the matter was not open for discussion and, in fact, no regulations limited management breaks.

Finally, plaintiff complained several times about what he characterized as the incompetence of human resources staff. In 1999 or 2000, he brought to the attention of supervisors the temporary misplacement of an employment application that plaintiff had delivered on behalf of a friend, and which was recovered after plaintiff reminded human resources that it had been received. In addition, in 2001 or 2002, plaintiff complained that the termination of another employee, Hines, was unfair and that an investigation related to the termination was inadequate.

Many of plaintiff's human resources complaints, however, arose out of an investigation concerning an e-mail that plaintiff forwarded to two colleagues in 2002. The e-mail announced that it is was "From: Tesfay Yohannes," one of plaintiff's coworkers, to 15 other coworkers, including plaintiff. It read, "I want to thank everyone for their support and help in getting me selected as the new Video Support Supervisor. I will strive to make thing [*sic*] better for us all." In fact, Yohannes did not send the message; several Lottery employees shared a common computer and, after Yohannes forgot to log off, someone else used his account to send the e-mail in his name, apparently as a joke. Kunz, a video support manager, was concerned that the prank was designed to embarrass Yohannes, who spoke with an accent, because the message was grammatically flawed. Another manager, Fleming, asked Lottery's human resources department to investigate the matter because he was concerned that it was motivated

by discrimination. A human resources employee, Jones, was assigned to conduct the investigation.

During the course of her investigation, Jones interviewed plaintiff and asked whether he had sent the e-mail or forwarded it to anyone else. Plaintiff stated that he had not—a statement ultimately discovered to be untrue—and during the interview, he leaned toward Jones in an agitated state, hit the table with his fists, complained that the human resources department was corrupt, and charged Jones with using "gestapo tactics" against him. Jones became nervous and called in a supervisor to attend the rest of the interview. The following day, plaintiff was asked to meet with Jones and three supervisors. His immediate supervisor memorialized the purpose of the meeting in a memo to plaintiff, which stated that his "behaviors have become threatening and on the verge of being insubordinate" and "created a hostile work environment." Plaintiff's supervisors told him to cooperate with the investigation, refrain from making "derogatory remarks regarding HR or coworkers," and "not to have any further conversations or comments related to the continuing investigation of the e-mail incident unless directed by management or HR." Plaintiff reacted with another outburst, pounding on the table and complaining about his employer and human resources. According to plaintiff, he felt "attacked" at the disciplinary meeting and "displayed defensive actions" in response. Plaintiff stated:

> "I had remained calm and professional until I felt that I was being backed into a corner. * * * If [Jones] felt threatened by me I'm sorry, but from experience, if you['re] going to conduct investigations, and interviews, you need to be prepared to go where ever that interview goes. If you push a person, you need to be prepared for resistance."

Plaintiff's supervisors suspended him without pay for a week and required him to take communication and anger management training. Plaintiff acknowledged behaving inappropriately, accepted the suspension, and stated that he had expected a worse punishment.

During plaintiff's absence, the investigation into the e-mail continued, and an information technology employee discovered that, contrary to his denial, plaintiff had received

the message and forwarded it to two colleagues, adding the words, "Can you believe this? He starts in 2 weeks!!"

Shortly after plaintiff returned to work, he was again asked to meet with supervisors. They discussed the fact that plaintiff had forwarded the e-mail and later denied doing so. Plaintiff was given a final written warning, which stated that his defiance of authority during and after the investigation was improper and that his dishonesty contravened rules requiring Lottery employees to exhibit high standards of integrity. He was warned that, unless his improper conduct stopped, he would face further discipline, including termination. Plaintiff again became agitated. He yelled at his supervisors and told Kunz that he was "dense." Plaintiff refused to sign or acknowledge receipt of the warning letter. He was subsequently terminated.

Plaintiff asserts that his various complaints were protected under the Whistleblower Law and the First Amendment to the United States Constitution, and that his termination was illegal retaliation for speaking out. The trial court granted defendant's motion for summary judgment on both claims, and this appeal ensued.

## II. WHISTLEBLOWER CLAIM

Plaintiff first asserts that the trial court erred in granting defendant's motion for summary judgment on the whistleblower claim. We review the record in the light most favorable to plaintiff, the party opposing the motion. *Yartzoff v. Democrat-Herald Publishing Co.*, 281 Or 651, 655, 576 P2d 356 (1978). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits * * * show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ORCP 47 C. Summary judgment was proper here.

ORS 659A.203 provides, in part:

"(1)   * * * it is an unlawful employment practice for any public employer to:

"* * * * *

"(b)   Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A)   A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;

"(B)   Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision[.]

"* * * * *

"(d)   Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section.

"(2)   No public employer shall invoke or impose any disciplinary action against an employee for employee activity described in subsection (1) of this section * * *."

The trial court ruled that, with respect to plaintiff's complaints about safety shoes and management breaks, plaintiff's belief that Lottery had engaged in "[m]ismanagement, gross waste of funds or abuse of authority" was not objectively reasonable; and that, with respect to plaintiff's complaints about a supervisor's misconduct and Lottery's human resources department, plaintiff's assertion that he was fired in retaliation failed because he presented no evidence from which a rational juror could conclude that the complaints caused the termination. We agree with the trial court's conclusion and affirm, albeit for slightly different reasons. *See Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001) (discussing "right for the wrong reason" principle for affirming judgment of trial court). We conclude that plaintiff's complaints were not within the purview of the statute, that is, they do not amount to the "disclosure of any information that the employee reasonably believes is evidence of" either a violation of law or "[m]ismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state[.]" Plaintiff therefore cannot prevail as a matter of law. Even if he was fired because of his complaints and not because of his dishonesty

and threatening conduct—a dubious proposition, given the undisputed facts, but one for a jury to decide—the termination was not a violation of the Whistleblower Law.

As a preliminary matter, we must address the question whether "disclosure of any information" includes a "disclosure" *within* the agency or department. In common usage, the term "disclose" may be understood to mean, in a general sense, "to make known" or to "open up to general knowledge." *Webster's Third New Int'l Dictionary* 645 (unabridged ed 2002). Based on its context, one might argue that the statute is designed to protect those who make disclosures to an audience *external* to the agency. Paragraph (1)(a), for example, is devoted entirely to prohibiting employers from hampering communications by employees to the Legislative Assembly. Further, in the popular conception, a "whistleblower" is typically a person who discloses internal misconduct to an *external* entity such as a newspaper or an investigating commission. However, ORS 659A.203(1)(b) protects "disclosure" without limitation, and we must not add limitations that the legislature has omitted. ORS 174.010. In addition, ORS 659A.221(2), also part of the Whistleblower Law, explicitly authorizes the public employer to establish rules requiring the whistleblower to report wrongdoing to immediate supervisors first, but in those circumstances, "the employer must protect the employee against retaliatory or disciplinary action." Thus, it seems that the drafters contemplated the possibility of retaliation against employees who voiced their complaints either within the agency or department, or to others outside.

Review of legislative history confirms this conclusion. ORS 659A.203 began as Senate Bill (SB) 1051 (1989). Over the course of the hearings concerning the bill before the House Labor and Senate Labor Committees, witnesses testified to a number of alleged instances of retaliation, most of which involved retaliation for reports of wrongdoing to officials within the employing agency. *See, e.g.*, Testimony, Senate Labor Committee, SB 1051, Mar 13, 1989, Ex I (statement of Lorrayne Ellis) (reporting retaliation for initiating position audit); Testimony, Senate Labor Committee, SB 1051, Mar 13, 1989, Ex J (statement of Tom Johnson and

Dennis Phillips) (reporting retaliation for questioning alteration of time cards); Testimony, House Labor Committee, SB 1051, May 22, 1989, Ex H (statement of Tony Corcoran) (describing same). Thus, it is clear that committee members were apprised of the possibility of retaliation for internal agency reports, and, as we explain below, they ushered in a policy that would address that problem.

■    Opponents to SB 1051 contended that sections of the new bill now codified as ORS 659A.203(1) and (2) were not necessary because they would replicate existing protections for whistleblowers made possible under *former* ORS 240.316(5) (1987), *repealed by* Or Laws 1989, ch 890, § 11. Tape Recording, Senate Labor Committee, SB 1051, Mar 13, 1989, Tape 63, Side A (statement of Art James). *Former* ORS 240.316(5) (1987) stated, in part, "No employe[e] shall be subject to disciplinary action or separation for disclosure * * * of violation of laws, rules, other improper actions or inefficiency of superior officers or fellow employe[e]s. The division shall * * * [e]stablish an appeal procedure for employe[e]s who suffer reprisal because of their disclosures." Art James, who testified against SB 1051, presented to the Senate Labor Committee a copy of the Executive Department's appeal procedure, established under *former* ORS 240.316(5) (1987), which permitted appeals from retaliatory actions due to disclosures within that department. Testimony, Senate Labor Committee, SB 1051, Mar 13, 1989, Ex L and Attachment B (statement of Art James and Executive Department Personnel Policy 1.6.1 (Oct 15, 1983)). The author of SB 1051, Senator Larry Hill, testified that among the merits of his bill was the fact that it would make such protections uniformly available to employees of all agencies, whether the reports of wrongdoing were made within or outside the agency. Tape Recording, Senate Labor Committee, SB 1051, Mar 13, 1989, Tape 63, Side A (statement of Sen Larry Hill). SB 1051 explicitly superseded and repealed *former* ORS 240.316(5) (1987). Or Laws 1989, ch 890, § 11. The bill passed through both committees without efforts to limit the protected actions to extra-agency disclosures of wrongdoing. Indeed, as explained above, the final verison included the provision now codified as ORS 659A.221(2), which explicitly requires employers to protect from retaliation employees who are

required by rule to make their initial reports of wrongdoing to supervisors. In sum, based on the text of ORS 659A.203 and indicators of the legislators' intent, we conclude that "disclosures" under that statute include reports of wrongdoing within an agency or department.

■    As a second preliminary matter, we must decide what the legislature intended by extending whistleblower protection to individuals who disclose information that they reasonably believe to be evidence of "mismanagement." That term gives us pause because, as the state points out, disclosures concerning "mismanagement," if interpreted broadly, could include complaints about lawful, legitimate policy choices or actions of little or no importance to anybody but the whistleblower, in which case the statute becomes not just a mechanism of good government but a shield for malcontents. The state suggests that "mismanagement" must refer to wrongful practices that are comparable in magnitude to other enumerated subjects in ORS 659A.203(1)(b)(B).

■ ■    We agree. The term "mismanagement" itself is ambiguous. Its dictionary definition, "corrupt or improper management," *Webster's* at 1444, could include a range of types and degrees of malfeasance. "Corrupt" management is mismanagement with a public dimension; "improper" mismanagement could be almost anything. In interpreting an ambiguous term in the text of a provision, we consider "rules of construction that bear directly on the interpretation of the statutory provision in context." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). One such textual maxim, *ejusdem generis*, is useful here. *See Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994) (applying *ejusdem generis*). That maxim holds that where general words either follow or precede specific words in a statutory enumeration, "the general words are construed to embrace only objects *similar in nature* to those objects enumerated by the * * * specific words." Norman J. Singer, 2A *Statutes and Statutory Construction* § 47.17, 273-74 (6th ed 2000) (emphasis added).

ORS 659A.203(1)(b)(B) provides protection for disclosure of the following list of subjects: "Mismanagement, gross waste of funds or abuse of authority or substantial and

specific danger to public health and safety resulting from action of the state[.]" The second and third terms, *"gross waste of funds or abuse of authority"* and *"substantial and specific* danger to public health and safety," contain modifiers indicating that the reported activity must rise in magnitude to a level of public concern in order for complaints about it to be protected. Thus, scrutiny of the statute itself, read according to rules derived from logic (as opposed to policy), suggests that the term "mismanagement" refers to malfeasance that, like the other types of malfeasance in subparagraph (1)(b)(B), undermines the agency's ability to perform its mission.

Legislative history indicates that our interpretation comports with the legislature's intent. The author of SB 1051, Senator Hill, stated before the Senate Labor Committee that the protected disclosures under the Whistleblower Law were substantively the same as those under *former* ORS 240.740 (1987), a statute superseded and repealed by SB 1051. Tape Recording, Senate Labor Committee, SB 1051, Apr 24, 1989, Tape 117, Side A (statement of Sen Hill). *Former* ORS 240.740 (1987) prohibited the disclosure of the identity of a public employee who provided information during an investigation concerning the "[v]iolation of any law or rule," "[g]ross waste of funds," "[a]buse of authority," or "[s]pecific danger to public health or safety." Referring to that statute, Senator Hill stated, "We're not proposing something brand new here." Tape Recording, Senate Labor Committee, SB 1051, Mar 13, 1989, Tape 62, Side A (statement of Sen Hill). Rather, he explained, the Whistleblower Law would extend protections to an individual who reported the same substantive information, so that the complainant would be protected from retaliation, rather than just identification. In doing so, Senator Hill equated the disclosures listed in *former* ORS 240.740 (1987) with those listed in SB 1051. Tape Recording, Senate Labor Committee, SB 1051, Apr 24, 1989, Tape 117, Side A (statement of Sen Hill). That suggests to us that, even though SB 1051 *added* the bare term "mismanagement," disclosures concerning "mismanagement" were required, in Hill's view, to rise to levels of public concern and

impairment of the agency's work as apparent in the other categories in *former* ORS 240.740 (1987), each of which had counterparts in SB 1051.[1]

Thus, when viewed as a whole, the legislative history leads us to conclude that protected disclosures of "mismanagement" are limited to disclosures of information similar in magnitude to the other listed categories. Such disclosures, then, do not include routine complaints about policies that employees must implement or practices that employees do not like. Rather, we conclude that the legislature intended "mismanagement" to refer to serious agency misconduct having the effect of actually or potentially undermining the agency's ability to fulfill its public mission.[2]

We turn, then, to the question whether any of plaintiff's disclosures fall within the types enumerated in ORS 659A.203(1)(b)(A) and (B). We conclude that none of them do.

■   Although plaintiff makes occasional general references to defendant's violation of rules, he does not identify with any particularity what statements he is referring to or what rules Lottery supposedly violated, nor does he develop any argument on that subject. Further, he does not demonstrate how any of his statements concerned danger to public health or safety, gross waste of funds, or abuse of authority under ORS 659A.203(1)(b)(B). Rather, the question reduces to whether any of his complaints concerned "mismanagement" as the legislature intended that term to be understood.

Plaintiff's disclosure concerning the practice of prohibiting employees from wearing Lottery-owned shoes outside of working hours is a quotidian complaint concerning his

---

[1] Indeed, with respect to public safety, SB 1051 heightened the standard for public safety disclosures from "[s]pecific danger" in *former* ORS 240.740 (1987) to "substantial and specific danger" to public health and safety.

[2] Other legislatures are more explicit. *See, e.g.,* Wis Stat § 230.80(7) (defining disclosure of information relating to "mismanagement" under whistleblower statute as a "pattern of incompetent management actions which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function[,] * * * not * * * the mere failure to act in accordance with a particular opinion regarding management techniques").

employer's execution of discretionary Lottery policy, not mismanagement. Similarly, plaintiff's disclosure concerning the Lottery break policy for line employees appears to have been motivated at least as much by dissatisfaction with what he perceived as differential treatment as by with waste of money, and, in any event, even if plaintiff believed that the differential treatment amounted to mismanagement, that belief was not reasonable. Nor is there any evidence in the record to support the inference that the sale of decommissioned ladders had any significant impact on the agency's fiscal condition or its ability to perform its function. Plaintiff's complaints concerning Newton's disparaging comments to a colleague about his stature are slightly more of a problem. If true, the report of the demeaning incident indicates an inappropriate interaction; however, it was quickly remedied, and it was not of a magnitude that could affect the agency's stewardship of public funds or its ability to fulfill its mission.

Finally, we reject plaintiff's argument that his complaints concerning Lottery's human resources department are within the protections of the Whistleblower Law. One set of complaints concerned the dismissal of a coworker, Hines, who was terminated after what plaintiff characterizes as a misunderstanding between Hines and his managers. After Hines was terminated (and based on Hines's reports concerning the termination), plaintiff told individuals in Lottery's human resources department that the investigation into the "misunderstanding" had been "inappropriate" and that they did not give enough weight to Hines's explanations. That complaint does not constitute a disclosure concerning "mismanagement"; rather, it is a reaction to an apparently routine employment process, the results of which plaintiff did not approve. We reach the same conclusion with respect to plaintiff's remarks concerning the handling of employment applications: rather than voicing a concern about a corrupt or wasteful management practice, plaintiff criticized Lottery's human resources department for a temporary error in its routine paper flow. Plaintiff's other criticisms of Lottery's human resources department over the course of the Yohannes e-mail investigation, in which plaintiff alleged that human resources was "corrupt" and used "gestapo tactics,"

are similarly devoid of any information disclosing misman-agement; they are simply invective.

■ We therefore conclude that the trial court did not err in granting defendant's motion for summary judgment on plaintiff's whistleblower claim. In so doing, we note that our decision is a narrow one: It means only that terminating an employee because his complaints are irritating or because they might disrupt the structure of a hierarchical workplace does not violate Oregon's Whistleblower Law unless the com-plaints disclose what are reasonably believed to be unlawful practices or policies, mismanagement, gross waste of funds or abuse of authority, or substantial and specific danger to pub-lic health and safety. We express no view as to whether such a termination violates some other authoritative norm such as a different state or federal statute, an administrative or common-law rule, or a collective bargaining agreement, nor do we express a view as to whether it is a good or a bad practice.

## III. SECTION 1983 CLAIM

Plaintiff next asserts that the trial court erred in granting defendant's motion for summary judgment on plain-tiff's claim that defendant violated his First Amendment right of free speech—a claim made actionable by the federal Civil Rights Act, 42 USC section 1983. Again, in reviewing the trial court's decision, we consider the evidence in the light most favorable to plaintiff and ask whether the record, including reasonable inferences drawn from it, discloses a genuine issue of material fact so as to preclude summary judgment. We affirm on the basis that plaintiff's statements did not deal with matters of public concern and were there-fore not constitutionally protected speech.

■ To determine whether imposing sanctions on a pub-lic employee for expressive activity at work violates the First Amendment, we typically proceed through a sequence of three inquiries. In some circumstances, however, we may resolve the issue in one step. *See Butler v. Dept. of Correc-tions*, 138 Or App 190, 198, 909 P2d 163 (1995) (applying *Connick v. Myers*, 461 US 138, 103 S Ct 1684, 75 L Ed 2d 708

(1983), and *Mt. Healthy City Board of Ed. v. Doyle*, 429 US 274, 97 S Ct 568, 50 L Ed 2d 471 (1977)). Briefly put, we determine first whether the employee's speech qualifies as a matter of public concern based on its subject matter and context. If it does, we proceed to balance the employee's interest in the speech against the employer's interest in the effective performance of its service to the public. If the balance favors the employee, the burden shifts to the employer to show that it would have taken the same action against the employee in the absence of the employee's speech; a finder of fact determines whether the employer met its burden. In this case, we resolve the matter at the first step.

■ ■   A public employee's First Amendment protection from retaliation for work-related expression extends only to speech on matters of truly public concern; it does not reach routine administrative complaints, whether those complaints are intended as useful attempts to shape agency policy or as responses to it. As the Supreme Court has explained,

> "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."

*Connick*, 461 US at 149. We have summarized the point more briefly: "No First Amendment protection is afforded speech intended to further a private interest that relates to internal administrative matters." *Robson v. Klamath County Board of Health*, 109 Or App 242, 247, 818 P2d 990 (1991), *rev den*, 314 Or 176 (1992) (citing *Connick*, 461 US at 146, 154). Thus, an employee's efforts to air employment-related grievances is far less likely to warrant First Amendment protection than are his or her efforts to focus the public's attention on malfeasance that amounts to a "breach of public trust." *Connick*, 461 US at 148. Whether statements constitute matters of public concern, then, depends not merely on the content of the statements, but also on their form and context, as revealed by the entire record. *Id.* at 148.

*Connick* and its interpretation in *Shockey v. City of Portland*, 313 Or 414, 426-31, 837 P2d 505 (1992), *cert den*, 507 US 1017 (1993), are instructive. In *Connick*, the plaintiff, Myers, an assistant district attorney, was fired after objecting to her proposed transfer within the department. 461 US at 140-41. In response to the planned transfer, Myers circulated among fellow employees a questionnaire containing questions premised on criticisms of her supervisors. *Id.* at 141. The district attorney viewed her efforts as openly insubordinate and terminated her. *Id.* Myers alleged that she was fired in retaliation for speech that was constitutionally protected. Before the United States Supreme Court, Myers argued that her words were protected because they addressed issues of "public importance" under the earlier case of *Pickering v. Board of Education*, 391 US 563, 88 S Ct 1731, 20 L Ed 2d 811 (1968), in which the Court held unconstitutional the termination of a teacher for writing a letter critical of school financing to a local newspaper. *Id.* at 142-43. Distinguishing the situation in *Connick* as a largely individualized and internal employment grievance, the Court defined the scope of the First Amendment's protection:

> "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

*Id.* at 146. The Court emphasized:

> "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the *most unusual circumstances*, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id.* at 147 (emphasis added). The Court provided a framework for determining when the requisite "most unusual circumstances" exist:

> "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole

record. In this case, with but one exception, the questions posed by Myers to her coworkers do not fall under the rubric of matters of 'public concern.' We view the questions pertaining to the confidence and trust that Myers' coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. * * * Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celèbre."

*Id.* at 147-48. The Court determined that only one question in the document, asking whether her colleagues " 'ever feel pressured to work in political campaigns on behalf of office supported candidates,' " touched upon a matter of public concern. Citing recent public attention to protecting employees from advocating candidates against their will and a "demonstrated interest in this country that government service should depend upon meritorious performance rather than political service," the Court held that "it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149.

In *Shockey*, the plaintiff, a wastewater mechanic, protested a policy that prohibited employees from wearing a beard. The asserted purpose of the policy was to ensure proper use of respirators in the event of chlorine exposure. *Shockey*, 313 Or at 416-18. The plaintiff wrote a petition attesting that the policy was " 'arbitrary and discriminatory' " and circulated it publicly "within his own city," and when he

subsequently disregarded the policy, he was fired. *Id.* at 416-17. He then sued under section 1983, alleging that he had been fired in retaliation for exercising his free speech rights by circulating the petition. *Id.* at 417. The court granted the employer's motion for a directed verdict, and the plaintiff appealed. The Supreme Court held that the plaintiff's speech was not protected, and the claim should have been dismissed on that basis. *Id.* at 430-31.

In doing so, the court examined the form, content, and context of the plaintiff's speech, as required under *Connick*, and noticed parallels between the facts of that case and *Connick*. The court listed the commonalities as indicia that weighed against the conclusion that a plaintiff's speech warranted constitutional protection:

"1.   Both cases arose out of an employee's dissatisfaction with a management decision that affected that particular employee in a way that the employee disliked.

"2.   Both employees attempted to enlist the views of fellow workers in support of their positions.

"3.   The principal thrust of each employee's message concerned the employee's particular grievance.

"4.   There is no suggestion that either employee raised any issue beyond the employee's immediate personal grievance other than for the purpose of gathering ammunition for the principal, personal fight that the employee already was waging.

"5.   Each employee confined the dispute to the workplace and to pertinent supervisory personnel."

313 Or at 430. Noting that the plaintiff's challenge to the no-beard policy was neither an objection to an illegal action, nor a comment on matters put to public vote, nor a protest of a policy that required his colleagues to relinquish any of their civil rights, the court concluded that "there truly is no matter raised by plaintiff's petition that is of 'public concern.' " *Id.*; *see also Robson*, 109 Or App at 244 (where county health department's policy for licensing caterers had "limited public interest, and the communication about it centers primarily on plaintiff's personal standards," plaintiff's criticisms of policy enforcement did not implicate matter of public concern).

■    In light of the foregoing review of applicable law, we cannot conclude that plaintiff's statements raised matters of public concern. Plaintiff's statements were chapters in a years-long dispute about the details of his and his coworkers' employment circumstances, a trend characterized by plaintiff himself as "outspokenness on management issues and Lottery policy and procedures." They were confined to the workplace and to intra-agency personnel, driven primarily by plaintiff's efforts to obtain conditions for himself and his colleagues according to his personal sensibilities; they were not voiced to a wider audience as an effort to encourage administrative reform.

Concerning the shoe policy, plaintiff's grievance was, like Shockey's, an expression of a management decision that affected him in a particular way. He simply objected to those rules, as well as to the break policy, because they violated his personal standards of professionalism and efficiency, despite the fact that the policies also effectively served legitimate public concerns and were not unlawful. With respect to the Hines termination, Newton's comments, and the employment applications matter, plaintiff sought to hold his managers (and Lottery's human resources department) accountable for their actions, but in doing so, he again applied his own yardstick, and he shed no light on "actual or potential wrongdoing or breach of public trust." *Connick*, 461 US at 148. Similarly, plaintiff's critical responses to Lottery's human resources department during investigation of his own apparently dishonest actions reveal nothing more than an artless lambaste against the regular workings of a bureaucracy.

The analysis in *Robson*, which explained why a sanitation official's extra-agency report of criticisms concerning his employer's regulatory policies did not implicate a matter of public concern, is easily applied here:

"The circumstances in this case indicate that, although plaintiff's complaint was not purely personal, in the sense that the supervisor's conduct affected the entire office, neither did it rise to the level of a report about a matter of public concern. Plaintiff was engaged in an ongoing dispute with his supervisor about the supervisor's management

style, policies and professionalism. Plaintiff * * * related examples of what he viewed to be unethical and improper policies and instances of unprofessional behavior. Because, under all of the circumstances, plaintiff's statement * * * was directed to a matter of internal office conditions and was not made as a citizen on a matter of public interest, the speech was not about a matter of public concern."

109 Or App at 250. In sum, plaintiff did not voice matters of public concern, and for that reason, he had no cognizable constitutional claim. The trial court did not err in granting defendant's motion for summary judgment on plaintiff's section 1983 claim.

Affirmed.